# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 9, 2021

Lyle W. Cayce
Clerk

No. 19-20023

Michael J. Hewitt,

*Plaintiff—Appellant*,

*versus*

Helix Energy Solutions Group, Incorporated; Helix Well Ops, Incorporated,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-2545

Before Owen, *Chief Judge*, and Jones, Smith, Wiener, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*.

James C. Ho, *Circuit Judge*, joined by Smith, Stewart, Haynes, Graves, Higginson, Costa, Willett, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*:

The Fair Labor Standards Act (FLSA) establishes a standard 40-hour workweek by requiring employers to pay "time and a half" for any additional time worked. *See* 29 U.S.C. § 207(a).

No. 19-20023

Congress has repeatedly rejected efforts to categorically exempt all highly paid employees from overtime requirements. *See, e.g.*, 84 Cong. Rec. 5458–59 (1939) (bill to exempt "employees employed at a guaranteed monthly salary of $200 a month or more"); H.R. 8624, 76th Cong. (1940) (bill to exempt all employees receiving a guaranteed monthly salary of $150 or more); 143 Cong. Rec. E317-04, E318, 1997 WL 79643, at *2 (Feb. 26, 1997) (proposing a bill to "create an income threshold that automatically exempts from FLSA scrutiny the highest paid strata of the workforce").

Accordingly, both the Secretary of Labor and the Supreme Court—as well as our court—have observed that "employees are not to be deprived of the benefits of the [FLSA] simply because they are well paid." *Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 167 (1945). *See also Parrish v. Premier Directional Drilling*, 917 F.3d 369, 388 (5th Cir. 2019) (same); 69 Fed. Reg. 22,122-01 (2004) (same).

Instead, Congress has authorized the Secretary to promulgate regulations exempting "bona fide executive, administrative, [and] professional" employees from overtime. 29 U.S.C. § 213(a)(1). Under that authority, the Secretary has exempted "highly compensated" (29 C.F.R. § 541.601) as well as more modestly paid "executive," "administrative," and "professional" employees (*id.* §§ 541.100, 541.200, 541.300).

To fall within any of these exemptions, however, three conditions must be met:  First, the employee must meet certain criteria concerning the performance of executive, administrative, and professional duties.  Second, the employee must meet certain minimum income thresholds.  Finally, the employee must be paid on a "salary basis."  And although the duties criteria and income thresholds vary from exemption to exemption, the regulations apply the same salary-basis requirement to all four exemptions. *See id.* § 541.100(a)(1) (applying the salary-basis test to executive employees); *id.* §

2

No. 19-20023

541.200(a)(1) (administrative employees); *id*. § 541.300(a)(1) (professional employees); *id*. § 541.601(b)(1) (highly compensated employees).

So earning a certain level of income is necessary, but insufficient on its own, to avoid the overtime protections of the FLSA. The employee must also be paid on a salary basis, as well as perform certain duties. And unless those tests are met, the employee is "not exempt . . . *no matter how highly paid they might be*." *Id*. § 541.601(d) (emphasis added) (specifying various professions that are subject to overtime regardless of the amount of income earned).[1]

It is the salary-basis test that is sharply contested in this case. Helix Energy Solutions Group claims that Michael Hewitt is exempt from overtime as a highly compensated executive employee under § 541.601. The parties agree that Hewitt meets both the duties requirements and income thresholds of both exemptions.

The company admits, however, that Hewitt's pay is "computed on a daily basis," rather than on a weekly, monthly, or annual basis.

As a matter of common parlance, we typically associate the concept of "salary" with the stability and security of a regular weekly, monthly, or annual pay structure. By contrast, we do not ordinarily think of daily or

---

[1] The lead dissent opens by emphasizing the "uncomfortable" fact that Hewitt is highly paid. But then it concedes in footnote 6 that the regulations expressly contemplate the potential for overtime "no matter how highly paid" the employee. 29 C.F.R. § 541.601(d). Moreover, the dissent does not deny that all three branches of government—Congress, the Labor Department, and the Supreme Court—agree with that conclusion. Nor should this consensus surprise anyone—to the contrary, we all agree that an employee who satisfies the income and duties requirements must also comply with (and thus potentially fail under) the salary-basis test.

hourly wage earners—whose pay is subject to the vicissitudes of business needs and market conditions—as "salaried" employees.

FLSA regulations reflect this dichotomy—defining salary as compensation paid "on a weekly, or less frequent basis," "without regard to the number of days or hours worked." *Id.* § 541.602(a) & (a)(1).

That is not to say that an hourly or daily rate can *never* meet the salary-basis test. But the Secretary has promulgated a special rule that must be satisfied before an hourly or daily rate will be regarded as a "salary."

That regulation is found in 29 C.F.R. § 541.604(b). And it explicitly states that an employee whose pay is "computed on a daily basis" must meet certain criteria to satisfy the salary-basis test:

> An exempt employee's earnings *may be computed on* an hourly, *a daily* or a shift *basis*, *without losing the exemption or violating the salary basis requirement*, *if* the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, *and* a reasonable relationship exists between the guaranteed amount and the amount actually earned.

*Id.* § 541.604(b) (emphases added). So a daily-rate worker can be exempt from overtime—but only "if" two conditions are met: the minimum weekly guarantee condition and the reasonable relationship condition.

Helix does not even purport to meet these conditions. Instead, Helix asks us to ignore them altogether.

But respect for text forbids us from ignoring text. As a matter of plain text, we hold that, when it comes to daily-rate employees like Hewitt, Helix must comply with § 541.604(b).

No. 19-20023

The same textual approach has been taken by both the Sixth and Eighth Circuits as well as the Labor Department—regardless of how much the employee is compensated.[2]  Likewise, the overwhelming majority of federal district courts to have addressed the issue have made clear that § 541.604(b) applies to daily-rate employees throughout the energy industry, regardless of the amount of their pay.

Helix could have easily complied with § 541.604(b)—for example, by offering a minimum weekly guarantee of $4,000 based on Hewitt's daily rate of $963.  *See*, *e.g.*, *Hewitt v. Helix Energy Sols. Grp.*, 983 F.3d 789, 801 (5th Cir. 2020) (Ho, J., concurring), *vacated on petition for rehearing en banc*, 989 F.3d 418 (5th Cir. 2020).  It has not done so.  Under the plain text of § 541.604(b), that is all that matters.

We reverse and remand for further proceedings.

---

[2] For example, the Sixth Circuit agrees that "[t]he text of § 541.602(a) does not tell us what to do when an employee's salary is *not* clearly calculated 'on a weekly, or less frequent basis.'"  *Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183, 189 (6th Cir. 2017).  Moreover, it specifically rejects the notion floated by the lead dissent here—namely, that in cases involving highly compensated employees, "we should pay no attention to § 541.604(b)," but should instead follow *Litz v. Saint Consulting Group, Inc.*, 772 F.3d 1 (1st Cir. 2014), and *Anani v. CVS RX Services, Inc.*, 730 F.3d 146 (2nd Cir. 2013).  *Id.*  As the Sixth Circuit notes, "what [the dissent here] misunderstands about [*Litz* and *Anani*] is that the situations in which those authorities ignore § 541.604(b) are situations in which . . . plaintiffs . . . were undisputedly guaranteed *weekly* base salaries"—unlike day rate workers like Hewitt.  *Id.* at 189–90 (emphasis added).  Likewise, the Eighth Circuit agrees that the "general" salary-basis rule set forth in § 541.602(a) is "subject to numerous interpretive rules"—including, most prominently, § 541.604(b).  *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 (8th Cir. 2020).  And the Labor Department agrees that, absent some special rule, daily rate workers "would not qualify as highly compensated employees" because "their day rate does not constitute payment on a salary basis."  U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2020-13, 2020 WL 5367070, *1 (Aug. 31, 2020).

No. 19-20023

## I.

Hewitt worked as a tool pusher for Helix for over two years. In that position, Hewitt managed other employees while on a "hitch"—that is, while working offshore on an oil rig. Each hitch lasted about a month.

Helix concedes that it paid Hewitt based solely on a daily rate. Helix also concedes that it required Hewitt to work well over forty hours per week.

The company nevertheless attempts to avoid the FLSA overtime penalty by characterizing Hewitt as a highly compensated executive employee. *See* 29 C.F.R. § 541.601.

To prevail, however, Helix must show that it paid Hewitt on a "salary basis" as defined by the regulations. *Id.* §§ 541.600(a), .601(b)(1). (Alternatively, Helix could have attempted to invoke the highly compensated employee exemption by showing that it paid Hewitt on a "fee basis," *see id.* §§ 541.601(b)(1), .605—but it has made no such argument in this appeal.)

Hewitt contends that Helix did not pay him on a "salary basis" because the company calculated his pay using a daily rate without satisfying the requirements of § 541.604(b). Helix responds that it was not required to comply with § 541.604(b).

The district court agreed with Helix and granted the company summary judgment. *Hewitt v. Helix Energy Sols. Grp.*, 2018 WL 6725267, at *3–*4 (S.D. Tex.). This appeal followed. We review the district court's interpretation of the applicable Labor Department regulations de novo. *See Davis v. Signal Int'l Texas GP, L.L.C.*, 728 F.3d 482, 488 (5th Cir. 2013).

## II.

This appeal requires us to do nothing more than apply the plain text of the regulations. Under 29 C.F.R. § 541.601, a highly compensated employee must be paid on a "salary basis" in order to avoid overtime. Under

6

§ 541.604(b), an employee whose pay is "computed on a daily basis" must meet certain conditions in order to satisfy the salary-basis test. And Helix admits that Hewitt's pay is "computed on a daily basis." Accordingly, Hewitt is subject to overtime unless his pay complies with § 541.604(b). If we are following the plain text of the regulations, that should be the end of the story.

**A.**

There are multiple components to the salary-basis test, as articulated in various Labor Department regulations. There is the "[g]eneral rule," 29 C.F.R. § 541.602(a)—and then there are various exceptions and provisos to that general rule. To properly understand and apply the salary-basis test, we must examine not only the general rule, but also any exceptions or provisos that bear upon a particular fact pattern—such as the daily rate presented in this appeal. Viewing the regulations as a whole, we conclude that Helix has failed to demonstrate that Hewitt is exempt from overtime.

The "[g]eneral rule" begins as follows: "An employee will be considered to be paid on a 'salary basis' within the meaning of this part if the employee regularly receives each pay period *on a weekly, or less frequent basis*, a predetermined amount constituting all or part of the employee's compensation." *Id.* § 541.602(a) (emphasis added). The rule further provides that "an exempt employee must receive the full salary for any week in which the employee performs any work *without regard to the number of days or hours worked*." *Id.* § 541.602(a)(1) (emphasis added).

Of course, some employers may prefer to pay certain workers on a daily or hourly rate—rather than on a "weekly, or less frequent basis," "without regard to the number of days or hours worked." The Secretary has accommodated this practice by promulgating a special rule dictating what

conditions must be satisfied before an hourly or daily rate will be regarded as a "salary":

> An exempt employee's earnings *may be computed on* an hourly, *a daily* or a shift *basis*, *without losing the exemption or violating the salary basis requirement*, *if* the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked, *and* a reasonable relationship exists between the guaranteed amount and the amount actually earned.

*Id.* § 541.604(b) (emphasis added).

Under this rule, an employee's earnings can "be computed on . . . a daily . . . basis, *without losing the exemption or violating the salary basis requirement*"—but only "if" certain other conditions are met.  That is, an employer can pay a daily rate under § 541.604(b) and still satisfy the salary-basis test of § 541.602—but only "if the employment arrangement also includes a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of the number of hours, days or shifts worked and a reasonable relationship exists between the guaranteed amount and the amount actually earned." *Id.*

This two-prong test protects employees in two ways.  First, the "minimum weekly" guarantee ensures that a daily-rate employee still receives a guaranteed amount each week "regardless of the number of hours, days or shifts worked." *Id.*  In other words, it sets a *floor* for how much the employee can expect to earn, "regardless" of how many hours, days, or shifts the employee works.  *Id.*  Second, the reasonable-relationship test ensures that the minimum weekly guarantee is not a charade—it sets a *ceiling* on how much the employee can expect to work in exchange for his normal paycheck, by preventing the employer from purporting to pay a stable weekly amount without regard to hours worked, while in reality routinely overworking the

employee far in excess of the time the weekly guarantee contemplates. And as the Labor Department has explained, without the reasonable-relationship test, "employees could routinely receive weekly pay of $1,500 or more and yet be guaranteed only the minimum required $455 (thus effectively allowing the employer to dock the employee for partial day absences)." 69 Fed. Reg. 22,184. But "[s]uch a pay system would be inconsistent with the salary basis concept and *the salary guarantee would be nothing more than an illusion*." *Id.* (emphasis added). *See also Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 185 (3rd Cir. 1988) (explaining that an employee is not paid on a "salary basis" if "the employee's usual weekly income" calculated on an hourly basis "far exceeds the 'salary' guarantee" the employer provided).

Helix does not comply with either prong of § 541.604(b). First, it pays Hewitt a daily rate without offering a minimum weekly required amount paid "regardless of the number of hours, days or shifts worked." 29 C.F.R. § 541.604(b). Helix theorizes that Hewitt's daily rate *is* the minimum weekly guaranteed amount. But a daily rate, by definition, is paid with regard to— and not "regardless of"—"the number of . . . days . . . worked." *Id.* Second, Helix does not comply with the reasonable-relationship test. Helix pays Hewitt orders of magnitude greater than the minimum weekly guaranteed amount theorized by Helix (Hewitt's daily rate). Tellingly, Helix does not contend that it satisfies the reasonable-relationship test.

## B.

The plain text of the regulations is decisive of this appeal. But it is worth noting that this textualist approach is also shared by the Sixth and Eighth Circuits and the Secretary of Labor—not to mention the overwhelming majority of district courts that have confronted these issues across the energy industry.

For example, in *Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183 (6th Cir. 2017), the plaintiffs admitted that they satisfied both the duties and income thresholds for highly compensated employees. *See Hughes v. Gulf Interstate Field Servs., Inc.*, 2016 WL 4197596, at *3 (S.D. Ohio), *modified on clarification*, 2016 WL 10592321 (S.D. Ohio), *and rev'd and remanded on other grounds*, 878 F.3d 183 (6th Cir. 2017) ("Plaintiffs do not contest that the other requisites for the highly compensat[ed] [employee] exemption are satisfied."). The issue was whether their pay also "satisfied the salary-basis test contained within 29 C.F.R. § 541.602(a)." *Id.*

The Sixth Circuit concluded that "[t]he text of § 541.602(a) does not tell us what to do when an employee's salary is *not* clearly calculated 'on a weekly, or less frequent basis.'" 878 F.3d at 189. Moreover, it explicitly rejected the notion (floated by the employer there, and the dissenters here) that "we should pay no attention to § 541.604(b)" in cases involving highly compensated employees. *Id.*

Likewise, the Eighth Circuit has concluded that the "general definition" of salary basis as set forth in § 541.602(a) is "subject to numerous interpretive rules," including § 541.604(b). *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 (8th Cir. 2020) (quoting § 541.604(b)). *See also id.* at 1048 (relying on *Hughes* and § 541.604(b)).

Our reading finds further support in a Labor Department opinion issued just last year by the Administrator of the Wage and Hour Division. That opinion concluded that, absent some special rule, daily rate workers "would not qualify as highly compensated employees" because "their day rate does not constitute payment on a salary basis." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2020-13, 2020 WL 5367070, *1 (Aug. 31, 2020). This "conclusion is further supported by [the Department] having specified certain instances when exempt executive, administrative, or

professional employees may be paid a daily rate while not more generally permitting a day rate to satisfy the salary basis test." *Id.* at *4 n.27 (noting as an example 29 C.F.R. § 541.709, which exempts certain motion-picture employees from complying with the salary-basis test at all).   So the Department "knows how to include in the exemption certain employees whose pay is calculated on a daily basis; it has chosen not to do so broadly." *Id.*   "The familiar 'easy-to-say-so-if-that-is-what-was-meant' rule of interpretation has full force here." *Id.* (cleaned up) (quoting *C.I.R. v. Beck's Estate*, 129 F.2d 243, 244 (2nd Cir. 1942)).   And that same logic of course applies to other daily rate provisions like § 541.604(b).   We agree with the respected Administrator.

Finally, federal district courts across the country have repeatedly warned the energy industry that their daily-rate workers are subject to § 541.604(b)—regardless of how well they are compensated.

For example, in *McQueen v. Chevron Corp.*, 2018 WL 1989937 (N.D. Cal.), "Chevron argue[d] that the Plaintiffs are exempt from overtime entitlement under the FLSA because the day rate they were paid exceeds $1,000"—*higher* than the day rate Helix paid to Hewitt. *Id.* at *1. Like Helix here, Chevron argued that "section 541.604(b) . . . does not apply to highly compensated individuals, such as Plaintiffs, who earned over $100,000 per year." Reply in Support of Motion for Partial Summary Judgment, *McQueen v. Chevron Corp.*, 2017 WL 6997700.   The district court rejected the argument, holding that "the day rate compensation scheme . . . does not satisfy the weekly salary requirement of the exemption defenses." 2018 WL 1989937, at *1.

Likewise, in *Wellman v. Grand Isle Shipyard*, 2015 WL 2169786 (E.D. La.), an energy company sought to avoid overtime on the basis of the highly compensated employee exemption. *Id.* at *2.   The district court noted that

No. 19-20023

the "employees' compensation need not be calculated weekly," provided that the compensation arrangement complies with the requirements of § 541.604(b). *Id.* The company noted that the plaintiff "*received* at least $455 in compensation during each week he worked as a Project Manager." *Id.* at *3. But as the district court pointed out in response, "this assertion does not address the regulations' requirement that the employment arrangement must 'include[] a *guarantee* of at least the minimum weekly required amount paid,'" as required under § 541.604(b).[3]

---

[3] *See also*, *e.g.*, *Senegal v. Fairfield Indus.*, 2018 WL 6079354, at *7 (S.D. Tex.) (entering summary judgment against oil and gas surveyor because it "multipl[ied] the days worked by the employee's day rate," thereby paying Plaintiffs "based on the number of days worked and not on a salary basis"); *Snead v. EOG Res.*, 2018 WL 1151138, at *2 (W.D. Tex.) (rejecting oil and natural gas company's argument that "it [was] permitted to calculate Plaintiff's pay on a day rate basis without losing this exemption pursuant to 29 C.F.R. § 541.604(b)" on the ground that "that regulation, like Section 602(a), requires 'a guarantee of at least the minimum weekly required amount paid on a salary basis regardless of hours, days or shifts worked'"); *Keen v. DXP Enters.*, 2016 WL 3253895, at *4 (W.D. Tex.) (rejecting oil company's claim that its pay arrangement "satisfied the 'minimum guarantee plus extra' test set forth at 29 C.F.R. § 541.604" because the record showed supervisors "would get paid for the days they worked, and that if they only worked one day during the week, they would only be paid for one day"); *Cator v. DXP Enters.*, 2016 WL 11580735, at *8 (W.D. Tex.), *report and recommendation adopted*, 2017 WL 11016498 (W.D. Tex.) (highlighting "material fact issues," including whether "plaintiff's pay, that was computed at a daily rate and actually received on a weekly basis, m[et] the salary basis test," and whether "the amount expected to be earned and actually earned by plaintiff during a normal scheduled work week b[ore] a reasonable relationship to the amount guaranteed, if any"). *See also Hiser v. NZone Guidance, LLC*, 2019 WL 2098110, at *4 (W.D. Tex.) (oil-drill company admitting that Plaintiffs "were not paid on a salary basis, and did not receive any guaranteed weekly compensation . . . irresepective of days worked" because they "were paid a day-rate").

Indeed, we are aware of just two district courts that have ever said that day-rate employees in the energy sector are *not* subject to § 541.604(b)—and neither offered any analysis other than citing our withdrawn opinion in *Faludi* and/or the dissent in *Hewitt II*. *See Scott v. Antero Res. Corp.*, 2021 WL 2012326, at *6–*8 (D. Colo.); *Sanchez v. Schlumberger Tech. Corp.*, 2020 WL 1445639, at *4 (S.D. Tex.). Neither of the district

No. 19-20023

In short, our decision today is hardly novel—and can hardly come as a surprise to the oil and gas industry.

## C.

1.    Helix's main response is that it is not required to comply with § 541.604(b), because Hewitt is a "highly compensated employee" under § 541.601.  In Helix's view, if an employee satisfies § 541.601, then there is no need to "also" satisfy § 541.604(b).  But § 541.601 expressly imposes a salary-basis test.  The text of § 541.601 makes clear that an employee's "'[t]otal annual compensation' *must include* at least $684 per week *paid on a salary . . . basis*."  29 C.F.R. § 541.601(b)(1) (emphases added).[4]  So Hewitt cannot be a "highly compensated employee" under § 541.601 unless his total annual compensation satisfies the salary-basis test.  And the only way for an employee to have his pay "computed on a daily basis" "without violating the salary basis requirement" is to comply with § 541.604(b).  *Id.* § 541.604(b).

Alternatively, Helix theorizes that it does not have to comply with § 541.604(b) because it complies with § 541.602.  But even accepting Helix's premise about § 541.602, it should go without saying that an employer must comply with *all* relevant regulations.  Helix admits that Hewitt's pay is "computed on a daily basis," so it must comply with § 541.604(b).  Indeed, § 541.604(b) makes this explicit:  It says that an otherwise "exempt" employee who is paid a daily rate "los[es] the exemption" and "violat[es]

---

courts in *Faludi* or *Hewitt* addressed, one way or another, whether daily-rate workers must comply with § 541.604(b).  *See Faludi v. U.S. Shale Sols. LLC*, 2017 WL 5969261, at *8 (S.D. Tex.) (citing § 541.604(b) only for the proposition that "[a]n employee's compensation need not be calculated weekly"); *Hewitt*, 2018 WL 6725267, at *3 (analyzing only § 541.602).

[4] The previous version of § 541.601 (which governs this case) requires compensation of "at least $455 per week."  *Id.* § 541.601(b)(1) (2014).

the salary basis requirement" unless the employer complies with § 541.604(b).

Notably, nothing in the text of either § 541.602 or § 541.604(b) indicates that those provisions apply differently based on how much the employee is paid. To the contrary, the same "salary basis" language that appears in the highly compensated employee regulation also appears in the regulations governing more modestly paid executive, administrative, and professional employees. Like their "highly compensated" counterparts, these employees are exempt only if they are "[c]ompensated on a salary basis." *See id.* § 541.100(a)(1) (executive employees); *id.* § 541.200(a)(1) (administrative employees); *id.* § 541.300(a)(1) (professional employees). There is no principled basis for applying or ignoring § 541.604(b) based on how much the employee is paid.

2.      Helix also contends that our understanding of the salary-basis test conflicts with *Litz v. Saint Consulting Group, Inc.*, 772 F.3d 1 (1st Cir. 2014), and *Anani v. CVS RX Services, Inc.*, 730 F.3d 146 (2nd Cir. 2013). To be sure, there is stray language in *Anani* that appears to be in tension with the approach we take today. *See Anani*, 730 F.3d at 149 ("We perceive no cogent reason why the requirements of C.F.R. § 541.604 must be met by an employee meeting the requirements of C.F.R. § 541.601."); *see also Litz*, 772 F.3d at 5 (quoting *Anani* but noting that "[p]laintiffs 'do not take a position on this issue'").

But there is no actual conflict here. That is for one simple reason that should be apparent from the face of the regulations: *Litz* and *Anani* involve pay calculated "on a weekly, or less frequent basis" (29 C.F.R. § 541.602(a))—and not pay "computed on . . . a daily . . . basis" (§ 541.604(b)). *See Litz*, 772 F.3d at 2 (employees were "guaranteed a minimum weekly salary of $1,000 *whether they bill[ed] any hours or not*")

(emphasis added); *Anani*, 730 F.3d at 148 (employee's "base weekly salary was guaranteed, i.e. to be paid *regardless of the number of hours . . . actually worked*") (emphasis added).

Indeed, the Sixth Circuit has already distinguished *Litz* and *Anani* on precisely this textual ground. As that court explained, "*Anani* and *Litz* involved plaintiffs who . . . were undisputedly guaranteed *weekly* base salaries above the qualifying level." *Hughes*, 878 F.3d at 189–90 (emphasis added). *See also id.* (rejecting the argument that the court "should pay no attention to § 541.604(b)," and explaining that *Litz* and *Anani* involved workers "whose pay was undisputedly calculated 'on a weekly, or less frequent basis'") (citing 29 C.F.R. § 541.602(a)).

We agree. There are both textual and precedent-based grounds for distinguishing this case from *Litz* and *Anani*. By contrast, there are no textual or precedent-based grounds for distinguishing this case from the opinions of the Sixth and Eighth Circuits and the Labor Department.

3.  Finally, Helix contends that extending overtime to highly-paid employees like Hewitt defies the purpose of the FLSA. In its en banc briefing, Helix protests that Hewitt's compensation at "well over $200,000 each year" is "a far cry from the wage practices against which the FLSA was created to protect"—and that "[a] highly compensated employee like Hewitt is not the worker the FLSA was enacted to protect."

But it should go without saying that we are governed by the text of the FLSA and its implementing regulations, not some unenumerated purpose. *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). And Congress has never amended the text of the FLSA to categorically exempt highly paid employees from overtime—to the contrary, as previously noted, it has repeatedly rejected efforts to do so.

No. 19-20023

Accordingly, the Supreme Court, our court, and the Secretary of Labor have all acknowledged that "employees are not to be deprived of the benefits of the [FLSA] simply because they are well paid." *Jewell Ridge Coal Corp*, 325 U.S. at 167. *See also Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 741 n.18 (1981) (same); *Parrish*, 917 F.3d at 388 (same); 69 Fed. Reg. 22,122-01 (same). In *Parrish*, for example, we held that "the FLSA . . . was intended to cover well-paid, well-trained workers like plaintiffs," and thus "rejected[] [the] assertion 'that [p]laintiffs are not the sort of low-wage employees the FLSA is designed to protect.'" 917 F.3d at 388. In fact, we granted overtime status to workers paid *more* than Hewitt—pay that "could well exceed $1,000 per day," *id.* at 384, totaling over "$300,000 per year," 280 F. Supp. 3d 954, 962 (W.D. Tex. 2017).

Indeed, if the Secretary had wanted to exempt employees based solely on the fact that they are well compensated, the regulations could have been written accordingly. In fact, as the Labor Department has publicly noted, "a number of commenters" have "urge[d] the Department to abandon the salary basis test entirely, arguing that [the] requirement serves as a barrier to the appropriate classification of exempt employees." 69 Fed. Reg. 22,176. But the Secretary has so far rejected those requests, and instead required *both* that the employee be paid at least a certain amount of compensation *and* that the compensation be paid "on a salary basis." *See id.* ("[T]he Department has decided that [the salary basis test] should be retained."). *See also* 3 Employ. Coordinator Comp. § 3:26 ("Note that a highly compensated employee must still meet the requirements of the salary basis test, being paid at least $684 on a salary basis, to be exempt from the overtime requirements. Thus, an employee earning over $100,000 will not necessarily

16

No. 19-20023

be a highly compensated employee if the employee's compensation is paid on an hourly basis.").[5]

\* \* \*

Our job is to follow the text—not to bend the text to avoid perceived negative consequences for the business community.  That is not because industry concerns are unimportant.  It is because those concerns belong in the political branches, not the courts.  "We will not alter the text in order to satisfy the policy preferences" of any person or industry.  *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002).  "These are battles that should be fought among the political branches and the industry."  *Id.*

We reverse the grant of summary judgment to Helix and remand for further proceedings consistent with this opinion.

---

[5] The amici put forth additional atextual theories that even Helix does not embrace. We likewise decline to entertain them.

No. 19-20023

James C. Ho, *Circuit Judge*, concurring:

The court today holds that Michael Hewitt is not exempt from overtime under the Fair Labor Standards Act (FLSA) unless his employer, Helix Energy Solutions Group, compensates him in accordance with 29 C.F.R. § 541.604(b). As the court explains, its textualist reading of § 541.604(b) is also supported by recent opinions of the Sixth and Eighth Circuits as well as the Labor Department.

As the court also notes, subsequent to our initial panel opinion in this case, an armada of amici "put forth additional atextual theories that even Helix does not embrace." *Ante*, at 17 n.5. I concur and write separately to address amici's contentions, as well as various additional arguments by the dissenters that Helix and amici do not make, and explain why they are all at war with the text.

**I.**

To begin with, the amicus brief filed by the States of Mississippi, Alabama, Louisiana, Montana, and Utah boils down to the following argument: We should read the regulations not to impose a salary-basis test, because the FLSA does not impose such a test. In sum, the five states ask us to construe the regulatory text to avoid a conflict with the statutory text. The lead dissent makes the same point—it emphasizes that the FLSA "exempts employees based on duties not dollars." *Post*, at 46.

But if it sounds like the five states are actually inviting us to *ignore* text, it's because they are. After all, the five states fully admit that the regulations expressly impose a salary-basis test.

So how exactly do they propose that we construe the regulations to *avoid* a salary-basis test, when the regulations *explicitly apply* a salary-basis test? *See*, *e.g.*, 29 C.F.R. § 541.100(a)(1) (requiring that executive employees

be "[c]ompensated on a salary basis"); *id.* § 541.600(a) ("To qualify as an exempt executive[] . . . employee . . . an employee must be compensated on a salary basis."); *id.* § 541.601(b)(1) (requiring that a highly compensated employee's total compensation include "at least $684 per week paid on a salary . . . basis").

Our duty is to interpret the text—not to ignore it. Recall *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012). There the Supreme Court construed the Affordable Care Act to avoid invalidity—just as the five states invite us to do here.

But it's one thing to construe a mandate as a "tax." *Id.* at 574. It's quite another thing to construe a mandate as *nothing at all*. Yet that is precisely what the five states ask us to do here—to construe the salary-basis mandate as nothing at all. That is not interpreting the text—that is invalidating it.

As the lead dissent admits, "whether the salary basis [test] is invalid is not the question before this court." *Post*, at 50. The question presented by the five states is not whether we can hold the regulation invalid, but whether we can construe the regulation to avoid conflict with statutory text. And the five states fully acknowledge that, in construing regulatory text to avoid statutory conflict, we must construe the text "fairly."

These admissions should be fatal to this argument. Because § 541.601 imposes a "salary basis" requirement—while § 541.604(b) applies when an employee's pay is "computed on a daily basis." You cannot "fairly" construe these regulations by simply reading those words out of the text.

Tellingly, Helix's supplemental en banc brief, filed two weeks after the states' amicus brief, fails to devote a single word to this theory. Nor was the amicus joined by the State of Texas—the oil and gas capital of the world (and Helix's home state).

No. 19-20023

## II.

For their part, the Independent Petroleum Association of America and the Texas Oil and Gas Association theorize that the court's reading of the plain text must be rejected because it is mathematically "illogical."

Their argument goes something like this:  To be exempt under § 541.601 as Helix claims, an employee must meet certain income thresholds—namely, a weekly minimum salary of $455 per week, or $23,660 annualized, and minimum total annual pay of $100,000.  If you divide the latter figure ($100,000) by the former ($23,660), you get "a correlation between the guarantee amount and the amount actually earned of 422.7 percent," as the Texas Oil and Gas Association observes.  That's "an over four-to-one ratio," the Independent Petroleum Association of America emphasizes.  The lead dissent makes the same point, albeit with one additional calculation:  It subtracts the weekly minimum salary from the minimum total annual compensation and notes that the balance is "three times the base salary." *Post*, at 42.  But the underlying mathematics remain the same.

Next, you take that ratio and compare it to the reasonable-relationship test under § 541.604(b).  As amici point out, the reasonable-relationship test contemplates smaller ratios—no more than "a weekly ratio of 150 percent of the guarantee," according to the Texas Oil and Gas Association.  The Independent Petroleum Association of America similarly concludes that "the § 541.604(b) reasonable relationship is satisfied if the additional amounts do not exceed approximately 50% of the guaranteed amount."

Amici have been pressing this mathematical argument since the en banc petition stage.  Yet the argument appears nowhere in Helix's briefs.

And for good reason.  I've heard of using dictionaries to discern the plain meaning of legal texts.  I've never heard of using a calculator.  Tellingly, amici do not cite a single case doing so.

Moreover, this is not the case to start. Because amici's mathematical calculations prove exactly nothing. When all is said and done, amici's point amounts to this: An employee's compensation can satisfy the income level requirements of § 541.601—yet violate the salary-basis test requirements of § 541.604(b).

Okay, but so what? I thought everyone agreed that the regulations impose a three-prong test: (1) the performance of certain duties, (2) income over a certain level, and (3) the salary-basis test. These are obviously separate and distinct requirements—the text makes this clear, and the parties do not dispute it. So an employer cannot prevail unless it meets all three requirements. And it is of course possible to satisfy one prong but not another. If that is all that amici is setting out to prove, then mission accomplished—but how this leads to judgment for Helix is a mystery.

Bottom line: If our goal is to follow the text, we should follow the text—not penumbras formed by emanations divined by a calculator. *Cf. Griswold v. Connecticut*, 381 U.S. 479, 484 (1965).

### III.

In addition, the dissenters offer three textual arguments that neither Helix nor any amici embrace.

First, the lead dissent "reiterate[s] that the text of § 541.601 makes no mention of § 541.604." *Post*, at 38. But neither do the regulations governing executive, administrative, and professional employees. *See* 29 C.F.R. §§ 541.100, .200, .300. So the dissent would render § 541.604(b) surplusage. Moreover, § 541.604(b) refers explicitly to the "salary basis" test—so the dissent is wrong to say there is no cross-reference here. *See id.* § 541.604(b). What's more, over a century of case law confirms that courts routinely construe one provision to apply to another, regardless of the absence of a cross-reference. *See, e.g., Lockhart v. United States*, 546 U.S. 142, 148 (2005)

(Scalia, J., concurring) (collecting cases holding that "Congress . . . may [enact] exempt[ions] . . . by 'fair implication'—that is, *without an express statement*") (emphasis added). The dissent does not cite any authority for declining to apply one provision to another based on the absence of a cross-reference. Not surprisingly, then, the Sixth and Eighth Circuits have rejected the dissent's reading—as do we. *See Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183, 189 (6th Cir. 2017) (rejecting suggestion that "we should pay no attention to § 541.604(b)"); *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1042 (8th Cir. 2020) (agreeing that the "general" salary-basis rule is "subject to numerous interpretive rules" including § 541.604(b)).[1]

Second, the lead dissent relies on the following two sentences from 29 C.F.R. § 541.0, which summarizes various FLSA regulations: "Subpart G contains regulations regarding salary requirements applicable to most of the exemptions, including salary levels and the salary basis test. Subpart G also contains a provision for exempting certain highly compensated employees." The dissent claims this passage somehow must mean that the latter provision is exempt from the former—that highly paid workers covered by § 541.601 are exempt from § 541.604(b). But there's a difference between merely summarizing two provisions and specifying how the two provisions interact with one another. Suppose we sum up our constitutional amendments as follows: "The amendments contain various individual rights, including freedom of speech. The amendments also contain a provision authorizing

---

[1] The dissent by Judge Wiener suggests *Hughes* and *Coates* do not apply here because the workers there did not perform the duties of highly compensated employees— that is, they were not "bosses" or "supervisors." *Post*, at 56–57. The dissenters' reading of case law is as curious as their interpretation of text. Here's what *Hughes* said: "The duties and salary-level tests are not in question here; the 'sole issue' is 'whether Hughes and McDonald met the 'salary basis' test.'" 878 F.3d at 188. Similarly, *Coates* noted that the "salary basis" requirement was the only "issue on this appeal." 961 F.3d at 1042.

states to regulate alcohol." Would that mean that the 21st Amendment is exempt from the 1st Amendment? Of course not. *See*, *e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484 (1996). Moreover, this case is even clearer. The 21st Amendment does not mention freedom of speech. By contrast, § 541.601 expressly incorporates the salary-basis test. In sum, nothing in § 541.0 justifies negating the clear text of § 541.604(b).

Finally, the separate dissent by Judge Wiener claims that the majority's textualist approach must "crumble" because, he worries, a "minimum [weekly] guarantee" under § 541.604(b) (1) "could be subject to reduction" (in other words, not "minimum"), (2) "could be disbursed daily rather than 'weekly'" (in other words, not "weekly"), and (3) "could not be predetermined" (in other words, not "guaranteed"). *Post*, at 60. But those worries will be realized only if you ignore the words "minimum," "weekly," and "guarantee." Not surprisingly, then, neither Helix nor any of the amici make this argument, either.

## IV.

The implicit message of the industry amici (and the dissenters) is that it is absurd to grant FLSA overtime to employees as highly compensated as Hewitt. But there are several problems with this absurdity argument.[2]

---

[2] For example, in his separate dissent, Judge Wiener says he "cannot fathom how a majority of the active judges of this court can vote to require Helix to pay overtime to Hewitt." *Post*, at 52. But earlier in this case, he was able not only to fathom, but to vote for, that very result. *See Hewitt v. Helix Energy Sols. Grp.*, 956 F.3d 341, 342, 344 n.4 (5th Cir. 2020) (opinion of Ho, J., joined by Wiener and Higginson, JJ.) (Hewitt was "entitled to overtime" because "Helix did not pay Hewitt on a salary basis, as § 541.604(b) expressly requires"). The only thing that has changed since then (besides the appearance of what the dissent fondly calls the "oyl biddness" amici, *post*, at 62) is the additional authority from the Eighth Circuit and the Labor Department.

To begin with, the Supreme Court, our court, and the Secretary of Labor have all observed that "employees are not to be deprived of the benefits of the [FLSA] simply because they are well paid." *Jewell Ridge Coal Corp*, 325 U.S. at 167. *See also Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 741 n.18 (1981) (same); *Parrish v. Premier Directional Drilling*, 917 F.3d 369, 388 (5th Cir. 2019) (same); 69 Fed. Reg. 22,122-01 (2004) (same). In *Parrish*, for example, we granted overtime status to workers paid *more* than Hewitt—pay that "could well exceed $1,000 per day," 917 F.3d at 384, totaling over "$300,000 per year," 280 F. Supp. 3d 954, 962 (W.D. Tex. 2017). Congress has likewise rejected efforts to impose income limits on FLSA overtime protections. *See ante*, at 2 (citing examples).

So amici are inviting us to declare all three branches of government absurd. The court rightly declines the invitation.

Moreover, the notion that highly compensated employees should never be entitled to overtime conflicts with the position of every member of this court. We all agree—and Helix concedes—that FLSA regulations impose a three-prong test for exempting highly compensated employees. Under that three-prong test, it is not enough that an employee is highly compensated. The employee must also perform certain duties, as well as satisfy the salary-basis test. A high income alone is never enough to exempt an employee from overtime. *See, e.g.*, 29 C.F.R. § 541.601(d) ("This section applies only to employees whose primary duty includes performing office or non-manual work. Thus, [certain workers] are not exempt under this section *no matter how highly paid they might be*.") (emphasis added).

Furthermore, what is so absurd about requiring Helix to follow the regulations? Helix can easily satisfy the salary-basis test and thereby avoid overtime—as I've previously explained, and Helix has never disputed. *See, e.g.*, *Hewitt v. Helix Energy Sols. Grp.*, 983 F.3d 789, 801 (5th Cir. 2020) (Ho,

J., concurring), *vacated on petition for rehearing en banc*, 989 F.3d 418 (5th Cir. 2020).  Just provide Hewitt a minimum weekly guarantee of, say, $4,000.  That's the economic equivalent of Hewitt's daily rate of $963.  *Id.*  Such an arrangement would benefit both parties.  Helix would avoid paying Hewitt overtime.  And Hewitt would enjoy a stable, predictable weekly income.

Finally, amici's suggestion of absurdity misunderstands the FLSA itself.

Many people conceptualize overtime as an incentive for workers to seek additional hours in order to earn higher income.  Viewed through that lens—as an *encouragement* to work overtime—it may be tempting to think of overtime primarily as a benefit for workers at the bottom of the income scale.

But that is not the only way—and perhaps not even the best way—to understand the FLSA.  Historically, "time and a half" has been understood as a "penalty" designed to "discourage" overtime.  *See*, *e.g.*, *Missel v. Overnight Motor Transp. Co.*, 126 F.2d 98, 104–5 (4th Cir. 1942), *aff'd*, 316 U.S. 572 (1942) (collecting cases describing overtime as a "penalty" designed to "discourage overtime").  Congress theorized that "the overtime rate . . . will be sufficiently expensive . . . that employers rather than pay overtime will spread employment."  *Id.* at 104.

Congress enacted the FLSA in the depths of the Great Depression.  Unsurprisingly, then, Congress sought to discourage overtime in order to encourage employers to hire more workers.  As the Supreme Court explained at the time, "one of the fundamental purposes of the Act was to induce worksharing and relieve unemployment by reducing hours of work."  *Missel*, 316 U.S. at 577 (quotations omitted).  The 50 percent overtime penalty incentivizes employers to hire two workers to work 40 hours, rather than one worker to work 80 hours.  *See*, *e.g.*, *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1176 (7th Cir. 1987) (Congress enacted the FLSA "to spread work

and thereby reduce unemployment, by requiring an employer to pay a penalty for using fewer workers to do the same amount of work as would be necessary if each worker worked a shorter week").

So the goal of the Act was not to induce overtime, but to avoid it. The FLSA achieves its ends when *no* employer pays overtime—when employers meet their labor needs by hiring more workers, not by requiring more hours.

To be sure, the FLSA burdens the business community and the freedom of contract. But the goal of the Act is not to benefit employers, but to increase employment.

And the social benefits of full employment should be obvious. Communities are better off when people are employed rather than idle. Millions of Americans prefer more free time over more money. And that is so regardless of how much one is paid. The desire to rest, recreate, and spend time with loved ones is not confined to any particular income strata.

## V.

Amici do not hide their displeasure with the court's reading of the governing regulations. The Texas Oil and Gas Association groans that "the Panel's Decision Threatens the Country's Hydrocarbon Industry"—while the Independent Petroleum Association of America and the Offshore Operators Committee blare that "THE PANEL'S ERRANT HOLDING NEGATIVELY IMPACTS A VITAL INDUSTRY." The dissent by Judge Wiener likewise condemns the majority—whose views he once endorsed, *see ante*, at 23 n.2—of causing a "vital industry" that "provides more than 400,000 direct jobs" to "suffer needlessly and excessively." *Post*, at 62.

As judges, however, we follow the law without regard to popularity. *See, e.g.*, *Gee v. Planned Parenthood of Gulf Coast, Inc.*, 139 S. Ct. 408, 410 (2018) (Thomas, J., dissenting from the denial of certiorari) ("We are not 'to

consult popularity,' but instead to rely on 'nothing . . . but the Constitution and the laws.'") (quoting FEDERALIST NO. 78, pp. 469–470 (C. Rossiter ed. 1961) (A. Hamilton)).  We ignore the booing of the crowd.  *Cf. Wilson v. Houston Community College System*, 966 F.3d 341, 345 & n.1 (5th Cir. 2020) (Ho, J., dissenting from denial of rehearing en banc).

In this case, the unhappy crowd happens to be the oil and gas industry.  But it does not matter which crowd is booing.  We apply the law as written— not as the industry would have written it.  *Cf. Ramirez v. Guadarrama*, 2 F.4th 506, 511 (5th Cir. 2021) (Ho, J., concurring in denial of rehearing en banc) ("As judges, we apply our written Constitution, not a woke Constitution.").

As demonstrated above, amici's arguments are at war with the text.  So we cannot credit them, no matter how important (or upset) the industry may be.  If the court's ruling today is bad for the industry (notwithstanding how easy it would be for Helix to comply with the salary-basis test), that is a policy consideration for the political branches—not the courts.

Justice Scalia once wrote:  "[S]uch questions as 'Who wins?' 'Will this decision help future plaintiffs?' 'Will it help future defendants?' 'Is this decision good for the 'little guy'?' 'Is it good for business?' . . . Questions like these are appropriately asked by those who write the laws, *but not by those who apply them.*" ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 352–53 (2012) (emphasis added).

This principle is applied not only by judges, but by Executive Branch officials as well.  Shortly after he took office—and before his Labor Department issued an opinion agreeing with our reading of its regulations (*ante*, at 5 & n.2, 10–11)—Secretary Eugene Scalia delivered an address in which he set forth the "principles that will guide me as Labor Secretary." Eugene Scalia, *Address at the Federalist Society's 2019 National Lawyers*

*Convention* (Nov. 15, 2019). His address noted his personal policy preference for free markets over legislative ordering, opining that excessive regulation "stifle[s] American innovation and productivity" and "burden[s] the economy." *Id.* But he emphasized that his duty as a "principal officer" under the Constitution is not to construe laws to favor business, but to help the President fulfill his duty under Article II "to take care that the laws be faithfully executed." *Id.* "[A]s Secretary of Labor I have a constitutional responsibility for the agency's enforcement activities under the statutes it administers." *Id.* Months later, the Department issued its opinion agreeing with our earlier panel decision in this case and concluding that, absent some special rule, daily rate workers "would not qualify as highly compensated employees" because "their day rate does not constitute payment on a salary basis." U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2020-13, 2020 WL 5367070, *1 (Aug. 31, 2020).

* * *

Amici may be disappointed, but they should not be surprised that the court today rejects their atextualist theories.

There's no such thing as a part-time textualist. If we're not textualists in every case, then we're not really textualists at all. *See*, *e.g.*, *Cole v. Carson*, 935 F.3d 444, 479 (5th Cir. 2019) (Ho & Oldham, JJ., dissenting) ("Originalism for me, but not for thee, is not originalism at all."). We're not binding ourselves to the text if we follow it only when we like the result. Textualism is either a matter of principle or a talking point.

We follow the text where it leads. Here, the text leads the court to side with labor over industry. So be it. I concur.

No. 19-20023

Edith H. Jones, *Circuit Judge*, joined by Owen, *Chief Judge*, and Wiener, Elrod, and Southwick, *Circuit Judges*, dissenting:

Appellant Hewitt is an experienced toolpusher[1] who was paid over $200,000 annually for supervising twelve to fourteen offshore oil and gas workers, comprising the drill crew, deck crew and subsea department of Helix's offshore operations.[2] Fewer than six percent of all Americans are paid as much as Hewitt.[3] Downplaying or omitting these and related uncomfortable facts, the majority employs their "textualist" reading of Fair Labor Standards Act regulations to provide Hewitt time-and-a-half on his hourly rate if he worked more than forty hours weekly during his offshore hitches.

---

[1] *Toolpusher*, Schlumberger: Oilfield Glossary, https://glossary.oilfield. slb.com/en/terms/t/toolpusher (last accessed June 29, 2021) ("The location supervisor for the drilling contractor. The toolpusher is usually a senior, experienced individual who has worked his way up through the ranks of the drilling crew positions. His job is largely administrative, including ensuring that the rig has sufficient materials, spare parts and skilled personnel to continue efficient operations. The toolpusher also serves as a trusted advisor to many personnel on the rigsite, including the operator's representative, the company man.").

[2] Toolpushers are important players in the rig leadership structure. *See The Key Players of the Deepwater Horizon*, Wall St. J. (Aug. 26, 2010), https://www.wsj.com/articles/SB10001424052748703632304575451761794054340 (identifying three toolpushers among the "key players" on the Deepwater Horizon when disaster befell the rig).

[3] For example, Census Bureau data indicates that individuals earning $200,000 annually in 2014 were among the top two percent of Americans reporting individual income. *See* Andrew Van Dam, *What Percent Are You?* Wall St. J. (Mar. 2, 2016), https://graphics.wsj.com/what-percent/. Hewitt accepted his job with Helix in 2014 and left in 2017. In 2017, based on data from the Current Population Survey series, a *household* earning $200,000 "was percentile 93.1%." *2017 Household Income Percentile Calculator for the United States*, DQYDJ, https://dqydj.com/household-income-percentile-calculator-united-states-2017/ (last visited Aug. 17, 2021) (based on data "for full-year January to December 2016").

No. 19-20023

The FLSA, however, exempts executive, administrative, and professional workers from overtime. 29 U.S.C. § 213(a)(1) (the "EAP" exemption). And the regulations further presumptively exclude such workers who are "highly compensated"—at half of Hewitt's salary. 29 C.F.R. § 541.601 (the "HCE" provision). For a statute designed to elevate the workingman, the majority's result seems counterintuitive, and in fact it is incorrect. The majority's result also runs counter to two other circuits' analysis. There is a much better textual interpretation, as we demonstrate below, which offers the additional nontrivial benefit of remaining faithful to the statutory text.

## I. BACKGROUND

Hewitt oversaw the drill crew, the deck crew, and the subsea department; completed personnel evaluations; ensured compliance with company policies; led safety meetings; and sometimes covered for the rig superintendent.[4] Consistent with these managerial responsibilities, Hewitt was paid, on a biweekly basis, a day rate of at least $963 for every day that he worked, regardless of the number of hours worked in a given day. His salary totaled over $200,000 per year, more than double the then-required amount of $100,000 needed to qualify as a highly compensated employee under § 541.601.[5]

---

[4] *See* Anne Kinsey, *The Salary of a Toolpusher*, HOUSTON CHRON. (Oct. 7, 2020), https://work.chron.com/salary-toolpusher-8125.html ("Toolpushers are senior oil drilling employees who are in charge of entire departments of oil drilling professionals. They combine their knowledge of the oil industry with leadership skills to ensure that rig personnel have all the equipment and tools they need for daily operations.").

[5] Since the filing of this case, § 541.601 was revised to increase the $100,000 total annual compensation threshold to $107,432. *See* § 541.601(a)(1). Similarly, the $455 weekly salary requirement was raised to $684. *See id.* at (b)(1). This opinion refers to the pre-increase amounts that were applicable to the facts raised in this case.

No. 19-20023

Hewitt concedes he performed the duties of an FLSA-exempt executive employee and was generously paid. But like many oil and gas production employees, Hewitt's salary was calculated at a day rate. Homing in on the "salary basis" component of the FLSA's HCE regulation, Hewitt seeks additional overtime compensation and denies that he was an exempt employee.

The district court rejected Hewitt's claim, only to be reversed by a divided panel's decision that Hewitt qualifies for overtime compensation. Upon en banc reconsideration of the appeal, a majority of this court now erroneously holds that Hewitt was not a highly compensated employee under the regulations. We disagree.

## II.    DISCUSSION

Hewitt is an FLSA-exempt executive employee for three reasons. First, he satisfies the regulations' HCE provision, § 541.601, which applies the statutory exemption to highly compensated employees. Second, the HCE provision, taken together with the regulatory text, structure, and history, plainly does not incorporate the separate provision, § 541.604, that is the textual sine qua non of the majority's analysis. Third, our construction of the regulations harmonizes with the statute, while the majority's reasoning creates discord.

### A.    Hewitt Is Exempt Under § 541.601's HCE Provision

We begin with the language of § 541.601 that is pertinent to a holistic interpretation.[6] Employees who are exempt as "highly compensated" under

---

[6] The EAP exemption does not apply to highly paid employees who do not perform executive, administrative, or professional duties. *See* § 541.601(d) (explaining that the provision "applies only to employees whose primary duty includes performing office or non-manual work," while it excludes, "no matter how highly paid," "non-management

No. 19-20023

§ 540.601 must receive over $100,000 in "total annual compensation," and perform "one or more of the exempt duties or responsibilities of an executive, administrative or professional employee," § 541.601(a)(1). (Hewitt concedes he fulfilled these requirements.)

The next subsection defines "total annual compensation" to "include at least $455 per week paid on a salary or fee basis as set forth in §§ 541.602 and 541.605,"[7] and the "[t]otal annual compensation may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period." § 541.601(b)(1).

Section 541.601(b)(2) refines the definition by adding a catch-up provision. If, at the end of the 52-week period, the $100,000 requirement has not been met, "the employer may, during the last pay period or within one month after the end of the 52-week period, make one final payment sufficient to achieve the required level." § 541.601(b)(2).

Because the definition of "total annual compensation" includes a minimum weekly payment on a salary basis set forth in § 541.602, we turn to that provision's general rule:

> An employee will be considered to be paid on a "salary basis" within the meaning of this part if the employee [1] regularly receives each pay period on a weekly, or less frequent basis, [2] a predetermined amount constituting all or part of the employee's compensation, [3] which amount is not subject to

---

production-line workers and non-management employees in maintenance, construction and similar occupations such as carpenters, electricians, mechanics, plumbers, iron workers, craftsmen, operating engineers, longshoremen, construction workers, laborers and other employees . . . .").

[7] Whether Hewitt may have been paid on a "fee basis" is not at issue in this case. *See* § 541.605 (defining "fee basis").

32

reduction because of variations in the quality or quantity of the
work performed.

§ 541.602(a)(numbers added).  The next subpart specifies that "an exempt
employee must receive the full salary for any week in which the employee
performs any work without regard to the number of days or hours worked,"
but "need not be paid for any workweek in which they perform no work."
§ 541.602(a)(1).

Hewitt satisfies the plain terms of the HCE test.  He received his
paycheck biweekly, as required by the first part of the salary basis test.  And
in any week in which he performed any work he was guaranteed a
"predetermined amount" of at least $963 (his day rate),[8] which represented
"part of" his compensation and was more than double § 541.601's $455
minimum salary.  Finally, Hewitt's $963 predetermined pay was not "subject
to reduction because of variations in the quality or quantity of the work

---

[8] The idea that a "predetermined amount" can be *computed* on an hourly (or daily)
basis and still count as a "salary" is hardly novel.  The Department of Labor and courts
under previous versions of the FLSA regulations were clear on this point.  *See* Opinion
Letter No. 395 [1961–1966 Wages–Hours Transfer Binder] Lab. L. Rep. (CCH) ¶
30,996.23 (Sept. 22, 1965) (addressing "highly-paid administrative and professional
employees employed by consulting firms on an irregular, project-by-project basis," and
concluding that "[t]he salary requirement would be satisfied by a payment in the prescribed
amount which is guaranteed to the employee for each week in which he performs any work
on a project or projects for the employer, even though this is only a portion of the
compensation paid him for such work *and the total amount continues to be measured by an
hourly or daily rate*" (emphasis added)); *see also Douglas v. Argo-Tech Corp.*, 113 F.3d 67, 71
(6th Cir. 1997) (recognizing "[a]n employee is salaried even if his compensation consists of
a guaranteed predetermined amount plus additional compensation," and finding support
in the 1965 Opinion Letter for the proposition that "hourly employees may be salaried if
they are guaranteed a predetermined number of paid hours" (citations omitted)); *Nairne
v. Manzo*, No. 86–0206, 1986 WL 12934, at *3 (E.D. Pa. Nov. 14, 1986) (Scirica, J.)
(unpublished) (considering how many hours an hourly employee was guaranteed, and
citing the 1965 Opinion letter for the proposition that "the salary requirement is met even
if the employee is paid on an hourly basis, as long as the employee is guaranteed the
minimum weekly requirement").

performed." He was paid that minimum if he worked a single second of a day and was paid regardless of the quality of his work. Thus, "for any week in which [Hewitt] perform[ed] any work" he was paid at least $963 "without regard to the number of days or hours worked."

It follows that the majority should have started—and ended—with the plain terms of § 541.602 to determine that Hewitt satisfied the salary basis test. Indeed, two other circuits have similarly concluded that once § 541.602's salary basis test is satisfied, that ends the analysis under the HCE exemption. *Anani v. CVS RX Servs., Inc.*, 730 F.3d 146, 149 (2d Cir. 2013) ("We perceive no cogent reason why the requirements of [] § 541.604 must be met by an employee meeting the requirements of [] § 541.601."); *Litz v. Saint Consulting Grp., Inc.*, 772 F.3d 1, 5 (1st Cir. 2014) (agreeing with *Anani* and noting that the plaintiffs "sensibly abandoned" the argument that the reasonable relation provision [§ 541.604] "applies to highly compensated employees").

Hewitt and the majority dodge the clear fit between Hewitt's total annual compensation and the exact requirements of § 541.601, as they contend instead that Hewitt was not compensated on a "salary basis." By artful use of italics, ellipses, and other misdirection, the majority describe § 541.602's salary basis test as an incomplete "general" rule to justify looking outside of § 541.602 to § 541.604 whenever an employee's pay is calculated on a daily basis. *Ante*, at ___. That assessment is plainly wrong. Section 541.602 sets out the "general rule" in subpart (a), which is supplemented by seven "exceptions" in its subpart (b) that together form a comprehensive salary basis test. Nothing in § 541.602 points to § 541.604.

The majority also edits § 541.604 to stand for the proposition that "an employee's earnings can 'be computed on . . . a daily . . . basis, *without losing the exemption or violating the salary basis requirement*'—but only 'if' certain

34

other conditions are met." *Ante*, at ___ (alterations in original). This strips § 541.604 of its key context. As explained in Part B(2) below, the regulations are clear that the "employees" covered by § 541.604 are those in the executive, administrative, and professional provisions set forth in §§ 541.100, .200, and .300. The whole point of § 541.604 is to make clear that *those* employees, when not covered by the HCE exemption,[9] *can* be paid a minimum guarantee plus extras without losing their EAP exempt status.

These fundamental textual errors were not committed by two sister circuits, whose decisions the majority unconvincingly tries to distinguish. The majority claims that § 541.604 has no bearing on those other cases because the employees' *base* salaries in *Litz* and *Anani* were "*calculated* 'on a weekly, or less frequent basis,'" and Hewitt's *day rate* was not. *Ante,* at ___ (emphasis added) (quoting § 541.602(a)). This contrast deceptively misstates the regulation: Section 541.602(a) requires only that the employee "*receive*[] . . . on a weekly, or less frequent basis, a predetermined amount." (emphasis added). Hewitt *received* his biweekly salary just like the *Litz* and *Anani* employees.

And contrary to the majority's reasoning, *Litz* and *Anani* do not rest on the computation method for base salaries. The majority's argument requires them to dismiss as "stray language" *Anani*'s two lengthy paragraphs, the bulk of the court's analysis, that explain why § 541.604 does not apply to employees exempt under § 541.601. *Ante*, at ___. In further tension with the majority's rationale, the employees in both *Anani* and *Litz* were paid for "extra work" on an hourly basis. *See Anani*, 730 F.3d at 147; *Litz,* 772 F.3d at 2. Given that under § 541.604(b), employee "*earnings* may

---

[9] As explained in Part B(1)(a) below, the HCE exemption separately accounts for minimum guarantees plus extras for employees it covers.

be computed on an hourly, a daily or a shift basis," the only reason to think the employees in *Anani* and *Litz* would not fall within § 541.604(b) is exactly the reason our sister circuits actually gave:  They were exempt under the HCE provision.[10]  § 541.604(b) (emphasis added).

## B.    Section 541.604 Does Not Apply to the HCE Provision

Since a plain text reading of §§ 541.601 and .602 confirms that Hewitt's compensation satisfied the HCE exemption and the salary basis test, the majority fall back on their real objection, that Hewitt's compensation fails to comply with § 541.604.  *But see Litz*, 772. F.3d at 5 ("[W]e see no reason why [§ 541.604's] requirements should be grafted onto the materially different exemption [§ 541.601] on which [the employer] relies." (citing *Anani,* 730 F.3d at 149).  But the text, structure, and history of the pertinent regulations belie the majority's conclusion.

Textualism "is not always easy," it "can be hard work and involve significant research," and it "is not glamourous," but done properly it is both "straightforward" and "fair." Diarmuid O'Scannlain, *"We Are All*

---

[10] The majority claims that the Sixth Circuit in *Hughes* shares its "textualist approach" to the regulations. *Ante*, at ___ (discussing *Hughes v. Gulf Interstate Field Servs. Inc.*, 878 F.3d 183 (6th Cir. 2017)).  That is triply wrong.  First, *Hughes* expressly declined to rule on whether § 541.604(b) applied to an exempt employee under § 541.601, so it did not adopt the majority's construction.  878 F.3d at 190 ("[W]e need not decide today whether [§ 541.604(b)] is the controlling source of evidence supporting our reading.").  The majority selectively quotes *Hughes*'s description of the *plaintiffs'* position in that case to suggest otherwise.  *See id.* at 189 ("Hughes and McDonald, however, point us to a neighboring provision that *might* be helpful." (emphasis added)).  Second, the $337 day rate in *Hughes* fell below the $455 minimum required by § 541.601, distinguishing it from Hewitt's $965 day rate that far exceeded the regulatory minimum.  *Id.* at 186.  Third, the *Hughes* court noted how that employee differed from the HCE exempt employees in *Litz* and *Anani,* "situations in which the textual requirements of 29 C.F.R. §§ 541.601, 541.602(a) are already clearly met."  *Id. at* 189 (citing *Litz*, 772 F.3d at 5; *Anani*, 730 F.3d at 149).

*Textualists Now": The Legacy of Justice Antonin Scalia*, 91 ST. JOHN'S L. REV. 303, 312 (2017). Doing the hard work here refutes the view that § 541.601's exemption for highly compensated employees must be read in light of § 541.604.

*First*, the text and structure of § 541.601 indicate that § 541.604 should not be read into § 541.601. The text does so in two ways: It expressly incorporates *only* § 541.602, and it provides separate rules for minimum guarantees plus extras that either overlap or are in tension with § 541.604. The majority, for instance, construes § 541.604 as safeguarding employees by providing a minimum weekly guarantee as the "floor" on what an employee must earn "regardless" of hours worked, and a "ceiling" on the work required in exchange for a paycheck.[11] *Ante*, at ___. But § 541.601 achieves a similar result with a different design: The minimum HCE total annual compensation ($100,000) is more than four times the annualized minimum weekly pay ($23,660). This HCE minimum thwarts unfair labor exploitation at least as effectively as § 541.604's minimum weekly guarantee and reasonable relationship tests. The provisions therefore overlap. Further, as will be seen, the "reasonable relationship" test found in § 541.604 conflicts with the "catch-up payment" provision of § 541.601.

*Second*, the broader regulatory structure confirms that the HCE provision, § 541.601, stands apart from the general regulations covering the EAP exemptions. *See* § 541.100 (Subpart B, executive employees); § 541.200 (Subpart C, administrative employees); § 541.300 (Subpart D,

---

[11] Section 541.604(b) provides, "An exempt employee's earnings may be computed on an hourly, a daily or a shift basis, without losing the exemption or violating the salary basis requirement, if the employment arrangement also includes a guarantee of at least the minimum weekly required amount [$455] paid on a salary basis regardless of the number of hours, days or shifts worked, and a reasonable relationship exists between the guaranteed amount and the amount actually earned."

professional employees).    Unlike the HCE provision, each of these regulations has its own Subpart, and they all use similar language and follow a nearly identical structure.  In contrast, the HCE provision is located among Subpart G's "Salary Requirement" provisions.  Critically, the Introductory Statement to the EAP exemption regulations, § 541.0, explicitly states that Subpart G (titled "Salary Requirement," which contains § 541.604) generally applies to these other Subparts, "including salary levels and the salary basis test."  But the Introductory Statement separately states that "Subpart G also contains a provision for exempting highly compensated employees." *Id.*  The HCE exemption, in other words, lies within but does not relate to all of Subpart G.

*Third*, the regulatory history confirms that § 541.602's salary basis test (expressly applied in § 541.601) is independent from § 541.604.  The two provisions were historically set together in one salary basis provision, but the minimum guarantee plus extras portion (now found in § 541.604) was excised from the salary basis test when the highly compensated employee exemption was first promulgated in 2004.

### 1.    The HCE Exemption's Text and Structure

We conclude that § 541.604 does not apply to employees who are exempt under § 541.601's freestanding provision for highly compensated employees.  We reiterate that the text of § 541.601 makes no mention of § 541.604.    Moreover, § 541.601 expressly incorporates only part of § 541.602's salary basis test but expressly omits § 541.602(a)(3).    The specificity with which § 541.601 was drafted compels the conclusion that an otherwise unidentified provision (§ 541.604) was not incorporated. *Expressio unius est exclusion alterius.*    *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW 107 (2012) [hereafter "Reading Law"].

The majority attempts to explain § 541.601's silence by observing that the more general EAP provisions are similarly silent as to whether § 541.604 applies. *Ante*, at ___. This is inaccurate, because as noted, the general EAP exemption subparts incorporate Subpart G in its entirety, including the "Salary Requirement," precisely because those subparts cover employees who earn as little as $23,660 annually ($455/week annualized). The HCE exemption, however, overarches and supersedes the general EAP coverages for employees who earn at least $100,000 annually. And because the HCE exemption already stands within Subpart G, it need only reference the express provisions of Subpart G (e.g. portions of § 541.602) that are necessary to accomplish its purpose.

Reinforcing this structural indicator, § 541.604 deals with compensation involving a minimum guarantee plus extras. Because the general subparts governing EAP employees do not separately address the situation of a minimum guarantee plus extras, and because those subparts fully incorporate Subpart G, § 541.604 must apply to lesser-paid EAP employees. But inasmuch as § 541.601 implements its own regime allowing extras to count toward the $100,000 total annual compensation, there is no need to advert to § 541.604.[12]  *See Anani*, 730 F.3d at 149 (recognizing that

---

[12] The distinction between the provision for highly compensated employees in § 541.601 and the general EAP subparts for executive, administrative employees is readily apparent textually. The EAP subparts use nearly identical language and follow the same structure. *See* § 541.100 (executive employees); § 541.200 (administrative employees); § 541.300 (professional employees). Not so for highly compensated employees, a category that overarches the general provisions to the extent of its high minimum compensation and different duties requirements. *See* § 541.601. In addition, the minimum salary set forth in the executive, administrative, and professional provisions is made expressly "pursuant to § 541.600," which is entitled "[a]mount of salary required," and is fixed at $455 weekly (or, as applicable, on a fee basis). *See* § 541.100(a)(1); § 541.200(a)(1); § 541.300(a)(1). But

"every employee with a guaranteed weekly amount exceeding $455 who earns over $100,000, and is therefore purportedly exempted by [] § 541.601, also fits the description of having a 'minimum guarantee plus extras'").

Looked at in more detail, § 541.601's rules for highly compensated employees either overlap or are in tension with § 541.604. *See Anani*, 730 F.3d at 149 (recognizing that § 541.601 and § 541.604 "each deals with different groups of employees who receive a 'minimum guarantee plus extras,'" and concluding the HCE exemption "is rendered essentially meaningless" if the employee "would lose the 'highly compensated employee' exemption by failing to qualify under [] § 541.604"); *cf. United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assoc., Ltd.,* 484 U.S. 365, 371, 108 S. Ct. 626, 630 (1988) ("Statutory construction [] is a holistic endeavor"); READING LAW at 180("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory.").

### *(a) The Provisions Overlap*

Sections 541.601 and 541.604 tread similar ground. As its title indicates, § 541.604 deals with situations where there is a "[m]inimum

---

§ 541.601 contains no mention of § 541.600 and only takes effect with total annual compensation of $100,000.

The majority erroneously asserts that Hewitt must show he was paid on a salary basis as defined by § 541.600(a). *Ante,* at ___. This reading of § 541.600 into § 541.601, however, results in conflict. Section 541.600 permits "[a]dministrative and professional employees," but *not* executive employees to be paid on a fee basis. But § 541.601 allows administrative, professional, *and* executive employees to be compensated on a fee basis. *Compare* § 541.600(a) (requiring executive, administrative or professional employees to "be compensated on a salary basis," but only permitting administrative and professional employees to alternatively be paid "on a fee basis") *with* § 541.601(a)–(b) (exempting any employee performing "executive, administrative or professional" responsibilities so long as total annual compensation includes a minimum portion "paid on a salary *or fee basis* as set forth in §§ 541.602 and 541.605" (emphasis added)).

guarantee plus extras."    Thus, § 541.604(a) allows "additional compensation" above the minimum weekly-required amount paid on a salary basis.    An employer may "provide an exempt employee with additional compensation without losing the exemption or violating the salary basis requirement."    § 541.604(a).    But § 541.601 independently deals with the minimum guarantee plus extras scenario.    In addition to incorporating  the § 541.602 salary basis test, § 541.601(b)(1) states that, "[t]otal annual compensation [$100,000 minimum] may also include commissions, nondiscretionary bonuses and other nondiscretionary compensation earned during a 52-week period."    To this extent, these provisions are parallel in permitting extras.

But unlike § 541.604, the "other nondiscretionary compensation" addressed in § 541.601(b)(1) need not bear a "reasonable relationship" to the guaranteed weekly minimum salary.    On the contrary, § 541.601(b)(2) expressly permits a single lump sum payment at the end of the year to meet the total annual compensation requirement.[13]

The majority's explanation that the reasonable relationship test sets a "*ceiling* on how much the employee can expect to work in exchange for his normal paycheck," *Ante*, at __, only emphasizes why § 541.604 does not apply to the HCE provision.    No doubt § 541.604 was intended to protect those employees to whom it applies from being overworked for their "normal

---

[13] The fact that both provisions describe a scenario where the "extra" comes in the form of sales commissions further supports the idea that they both address the same minimum guarantee plus extras.  *Compare* § 541.601(b)(2) (illustrating a base salary above the minimum but below the required total annual compensation threshold where sales commissions did not take the employee's total compensation over the threshold, and permitting an end-of-year payment to make up the difference) *with* § 541.604(a) (stating that, "for example, an exempt employee guaranteed at least [$455] each week paid on a salary basis may also receive additional compensation of a one percent commission on sales").

paycheck." But as already explained, § 541.601's total annual compensation requirement achieves a similar result with a different structural design. To put it bluntly, a highly compensated employee who earns "total annual compensation" of *at least* $100,000, supposing the salary basis test to have been met, can hardly claim to be overworked. That § 541.601(a) requires a very *high* level of compensation before it even applies protects significantly against exploitation.

### *(b) Sections 541.601 and 541.604 are in Tension*

Further illuminating the incompatibility between these provisions is that § 541.601's treatment of a minimum guarantee plus extras for highly compensated employees authorizes an *unreasonable* relationship between base and total compensation. Unlike § 541.604, the highly compensated employee provision approves of large, unequal payments if they are necessary to meet the high total annual compensation threshold. These payments can take any form—hourly, daily, weekly, monthly, or an employer can even cut a single check at the end of the year—if the employer provides a § 541.602-compliant minimum base salary. Nor does § 541.601 concern itself with how the minimum base salary is computed as long the employee "regularly receives" each pay period the required "predetermined amount" under § 541.602's salary basis test. What's important is that the total annual compensation threshold is satisfied.

To illustrate this point, an employer may satisfy the HCE provision by paying a weekly amount of $455 (resulting an annual salary of only $23,660) and make up the entire remainder at the end of the year to achieve total annual compensation of $100,000. *See* § 541.601(b)(2). This permissible catch-up payment of three times the base salary fails § 541.604's reasonable relationship test. But this result is permissible for highly compensated employees for the same reason that the HCE exemption does not require "a

detailed analysis" of their job duties: "A high level of compensation is a strong indicator of an employee's exempt status." § 541.601(c).

Reading § 541.601 and § 541.604 together, as the majority does, effectively eliminates the HCE exemption for a day-rate-paid executive unless the executive also receives a weekly salary in line with the 541.604(b)'s "reasonable relationship" test. The majority inadvertently proves this point by asserting that Helix could have "easily complied with § 541.604(b)" by offering a weekly salary of $4,000. *Ante*, at ___. But the highly compensated employee test requires only $455 be paid on a salary basis pursuant to § 541.602. Thus, grafting of § 541.604 onto § 541.601 rewrites the required base salary and upends the balance struck by § 541.601 between the minimum salary and total annual compensation.

Another illustration shows how significantly § 541.604 could rewrite the base salary requirement in § 541.601. A Department of Labor opinion letter suggests that the § 541.604 reasonable relationship test is satisfied if the additional amounts do not exceed approximately 50% of the guaranteed weekly minimum.[14] If it were applicable to § 541.601, this standard would mean an employee whose total annual compensation equals the $100,000 HCE threshold must have a guaranteed "base salary" of $66,666.67 per year, or $1,282.04 per week. To repeat, the HCE exemption, by its own terms, requires a minimum $455 per week paid on a salary basis. The majority ignores the text and rewrites the regulations.

---

[14] The letter, interpreting § 541.604, not the HCE exemption, recognizes that a "1.5-to-1 ratio of actual earnings" is not, under the regulations "the maximum permissible ratio," but recognizes the regulation "provide[s] a range of permissible ratios from 1.2-to-1 to 1.5-to-1" and concludes a ratio of 1.8-to-1 "exceed[s] the permissible ratios found in the regulations." Dep't of Labor, Opinion Letter FLSA2018-25, at *2 (Nov. 8, 2018).

### 2.    Broader Regulatory Structure

The post-2004 regulatory structure of the EAP exemptions further reinforces § 541.604's inapplicability to § 541.601.    29 C.F.R. Part 541 includes eight subparts (A–H).[15]  Subpart A lays out the regulation in general terms, while Subparts B–F address specific exemption categories. Executive, administrative, and professional employees each have a subpart (found in B–D, respectively).  The exemption for highly compensated employees does not have its own subpart but is included within Subpart G, titled "Salary Requirement."

This location proves important.  Subpart A's Introductory Statement explains that "Subpart G contains regulations regarding salary requirements applicable to most of the exemptions" and refers to Subparts B–D listed above.  Separately, it states that Subpart G "also contains a provision for exempting certain highly compensated employees."  § 541.0(b).  In other words, the Introductory Statement recognizes that Subpart G (which includes § 541.604) generally applies to each of the exemption categories defined in the regulations *other than* the highly compensated employee provision that is housed within Subpart G itself.  *See Anani*, 730 F.3d at 150 (recognizing the significance of the fact that the highly compensated employee "regulation is found in the 'Salary Requirements' Subpart rather than in the 'duties requirements' Subparts, and there is direct evidence that this placement was not the result of administrative inadvertence").  In short, the highly compensated employee provision's text and structure indicate the HCE provision is *sui generis*.

---

[15] Subpart H covers Definitions and Miscellaneous Provisions and is not relevant for our purposes here.

### 3.    Regulatory History

The regulatory history confirms our conclusion.  The minimum guarantee plus extras provision used to be part and parcel of the salary basis test.[16]  At that time, the executive, administrative, and professional sections each explicitly incorporated the salary basis test along with its minimum guarantee plus extras subsection.[17]  But in 2004, the Department of Labor first promulgated the provision for highly compensated employees in § 541.601.  The Department excised the minimum guarantee plus extras subsection from the salary basis provision and, for the first time, transformed that subsection into a new § 541.604.  The timing is meaningful.  Contemporaneous with the creation of the regulatory exemption for highly compensated employees came the decoupling of today's § 541.604 from the salary basis test.  And of course, § 541.601 is explicit that it incorporates only part of the § 541.602 salary basis test, while it fails altogether to mention the then-equally-new § 541.604.  Why spin off § 541.604 only to have courts effectively re-incorporate it back *sub silentio* into the new highly compensated employee exemption?

---

[16] For example, in the 2002 version of the regulations, the salary basis test can be found in § 541.118.  Subpart (a) is the predecessor to today's salary basis test now found in § 541.602.  Subpart (b) is entitled "[m]inimum guarantee plus extras" and is the predecessor to today's § 541.604.

[17] The pre-2004 regulations set out the full meaning of salary basis within the broader section covering executive employees.  § 541.118 (2002).  The professional and administrative sections then expressly incorporated the definition of salary basis as set forth in § 541.118.  *See* § 541.212 (2002) ("The explanation of the salary basis of payment made in connection with the definition of 'executive' is also applicable in the definition of 'administrative.'"); § 541.312 (2002) ("The salary basis of payment is explained in § 541.118 in connection with the definition of 'executive.'").

No. 19-20023

## C.    Statutory Construction

The majority's conclusion is also at odds with the statute itself, which exempts employees based on duties not dollars.[18]  The FLSA exempts "any employee employed in a bona fide executive, administrative, or professional capacity."   29 U.S.C. § 213(a)(1).   The plain meaning of this exemption focuses on an employee's duties, and it should be interpreted fairly.  *See Encino Motorcars, L.L.C. v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (emphasizing that courts "have no license to give the exemption[s] anything but a fair reading"); READING LAW at 364 (disputing "[t]he false notion that remedial statutes should be liberally construed").

Two words, in particular, support this conclusion:  "capacity" and "bona fide."   The plain meaning of capacity is "[a]bility; capability; possibility of being or of doing."   *Capacity*, WEBSTER'S NEW INTERNATIONAL DICTIONARY (W. T. Harris & F. Sturges Allen eds., 1930). And the word "bona fide" emphasizes that the "executive, administrative, or professional capacity" must be "[i]n or with good faith; without fraud or deceit; real or really; actual or actually; genuine or genuinely; as, he acted *bona fide*; a *bona fide* transaction."[19]   *Bona Fide*, WEBSTER'S NEW

---

[18] No one seriously disagrees that, based on the language in the statute itself, Hewitt is precisely the kind of highly paid, supervisory employee the EAP exemption was meant to exclude from overtime. *See Faludi v. U.S. Shale Sols., L.L.C.*, 936 F.3d 215, 221 (5th Cir. 2019) (Ho, J., dissenting), *withdrawn and reissued*, 950 F.3d 269 (5th Cir. 2020) (concluding under similar facts that "[i]f we were looking only at statutes enacted by Congress, I would join my colleagues in affirming the district court, because it seems obvious that [the employee] was 'employed in a bona fide . . . professional capacity' and therefore exempt from the overtime requirements of the Fair Labor Standards Act." (citing 29 U.S.C. § 213(a)(1) and ellipsis in original)).

[19] The meaning of these terms in this context remains more or less the same in modern usage.  *See, e.g.*, *Capacity*, OXFORD ENGLISH DICTIONARY ONLINE (2021) (defining capacity as "[t]he power, ability, or faculty for anything in particular"); *Bona*

INTERNATIONAL DICTIONARY (W. T. Harris & F. Sturges Allen eds., 1930); *accord Nevada v. U.S. Dep't of Labor*, 275 F. Supp. 3d 795, 804–05 (E.D. Tex. 2017) (relying on comparable dictionary definitions from 1933). Similarly, the phrase "employee *employed in* a bona fide . . . capacity" emphasizes a focus on the employee's actual duties.[20]

In the same vein, recent agency rulemaking recognizes that the EAP exemption itself focuses on an employee's duties, as distinguished from the regulatory application of a salary test. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 84 Fed. Reg. 51,230, 51,238 (Sept. 27, 2019) (codified at 29 C.F.R. 541) [hereinafter 2019 Final Rule] (recognizing that salary level is generally "not a substitute for an analysis of an employee's duties," but is, "at most, an indicator of those duties").[21] In other words, the exemption is

---

*Fide*, OXFORD ENGLISH DICTIONARY ONLINE (2021) (defining the term to mean "[i]n good faith, with sincerity; genuinely").

[20] Our cases have made a similar observation regarding the seaman exemption, which applies to "any employee *employed as* a seaman." 29 U.S.C. § 213(b)(6) (italics added). *See, e.g.*, *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 523 (5th Cir. 1989) (recognizing that the "italicized words mean something" and are not "mere tautology"; instead they "warn us to look to what the employees do" rather than "rest on a matter of a name, or the place of their work" (quoting *Walling v. W.D. Haden Co.*, 153 F.2d 196, 199 (5th Cir. 1946)).

Consistent with that understanding, our cases frequently characterize the EAP exemption as applying to those "working in" a bona fide executive, administrative or professional capacity when describing the statute. *See, e.g.*, *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 331–33 (5th Cir. 2000) (recognizing the exemption applies to employees "*working in* a bona fide executive, administrative or professional capacity" (emphasis added)); *Cowart v. Ingalls Shipbuilding, Inc.*, 213 F.3d 261, 266 (5th Cir. 2000) (same); *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020) (same).

[21] *See also* 2019 Final Rule, 84 Fed. Reg. at 51,237 ("Salary is a helpful indicator of the capacity in which an employee is employed, especially among lower-paid employees. But it is not 'capacity' in and of itself."); *Defining and Delimiting the Exemptions for*

concerned with an employee's actual duties as performed in the course of his or her employment.

From its inception, the salary test's purpose was to serve as a helpful screen to filter out employees who are not actually employed in a bona fide executive, administrative, or professional capacity.[22] In other words, recognizing how fact-intensive a duties analysis can be, the salary test, consisting of a salary level and salary basis component, provides a shortcut to narrow the pool of employees whose duties merit a closer look.

Ultimately, the validity of the salary test turns on its effectiveness as a filter for duties. The Department of Labor's broad rulemaking authority stops at the statute's borders. Here, that means the regulations cannot supplant the statutory exemption based on an employee's duties with a salary-based exemption. As the majority recognizes, Congress has declined to exempt employees based on their pay. *Ante*, at ___. True enough.

---

*Executive, Administrative, Professional, Outside Sales and Computer Employees*, 69 Fed. Reg. 22,122, 22,165 (Apr. 23, 2004) (codified at 29 C.F.R. 541) ("The salary level test is intended to help distinguish bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these exempt categories.").

[22] *See* Harry Kantor, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 2–3 (1958) ("Essentially, the salary tests are guides to assist in distinguishing bona fide executive, administrative, and professional employees from those who were not intended by the Congress to come within these categories."); Harry Weiss, *Report and Recommendations on Proposed Revisions of Regulations, Part 541*, at 8 (1949) [hereinafter "Weiss Report"] ("[T]he best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them."); Harold Stein, *Report and Recommendations of the Presiding Officer at Public Hearings on Proposed Revisions of Regulations, Part 541*, at 42 (1940) [hereinafter "Stein Report"] ("The salary paid the employee is the best single test of the employer's good faith in characterizing the employment as of a professional nature.").

Congress elected to exempt employees based on the capacity in which they are employed. It's their duties and not their dollars that really matter.

And the Department of Labor recognizes this limitation. For example, in 2016 the agency promulgated a rule substantially increasing the salary level required to qualify as an exempt employee. *Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees*, 81 Fed. Reg. 32,391 (May 23, 2016) (setting "the standard salary level for exempt EAP employees at the 40th percentile of weekly earnings of full-time salaried workers in the lowest-wage Census Region"). This change had the effect of excluding from the exemption 4.2 million employees who were in fact employed in a bona fide executive, administrative and professional capacity and who would otherwise have been exempt. *See* 2019 Final Rule, 84 Fed. Reg. at 51,238; *Nevada*, 275 F. Supp. 3d at 806 (indicating the rule "more than doubles the Department's previous minimum salary level"). A district court enjoined the rule because it made "overtime status depend predominately on a minimum salary level, thereby supplanting an analysis of an employee's job duties." *Nevada*, 275 F. Supp. 3d at 806. The district court concluded that a minimum salary level is permissible to the extent it "serves as a defining characteristic when determining who, in good faith, performs actual executive, administrative, or professional capacity duties." *Id.* at 806. The Department of Labor accordingly withdrew the rule and promulgated a new rule in 2019. In the new rule, it discussed the district court decision, recognized "the 2016 final rule was in tension with the Act," and emphasized that a "salary level set that high does not further the purpose of the Act, and is inconsistent with the salary level test's useful, but limited, role in defining the EAP exemption." 2019 Final Rule, 84 Fed. Reg. at 51,238.

No. 19-20023

In sum, every salary test does not necessarily pass statutory muster.[23] But whether the salary basis component of the test (found in § 541.602) is invalid is not the question before this court.[24] *Cf. Auer v. Robbins*, 519 U.S. 452, 457, 117 S. Ct. 905, 909 (1997) (upholding an agency interpretation of salary basis while recognizing that the respondents "do not raise any general challenge to the Secretary's reliance on the salary-basis test"). The question before us is whether § 541.604 should apply to day rate employees who are otherwise obviously exempt under § 541.601's highly compensated employee provision. Today's holding that day rate toolpushers like Hewitt, who are "in charge of entire departments of oil drilling professionals," are not actually exempt stands in obvious tension with the statute's focus on an employee's duties,[25] as well as the "limited" role of the salary test in

---

[23] With respect to the salary level component of the test, a panel of this court has concluded that it can fall within the bounds of the statutory text when appropriately set. *Compare Wirtz v. Miss. Publishers Corp.*, 364 F.2d 603, 608 (5th Cir. 1966) (rejecting the argument that "the minimum salary requirement is not a justifiable regulation under Section 13(a)(1) of the Act," and concluding the then-applicable salary threshold was not "arbitrary or capricious"), *with Nevada*, 275 F. Supp. 3d at 806 (recognizing that *Wirtz* approved of a salary level test for "*identifying* categories of employees Congress intended to exempt," but concluding the revised threshold exceeded the scope of the statute (citing *Wirtz*, 364 F.2d at 608) (italics in original)).

[24] It's worth noting that the salary level portion of the test seems to have the strongest support as a screen for duties in the regulatory history. *See, e.g.*, Weiss Report at 8 ("[T]he best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them."); Stein Report at 42 (similar). Justifications for the salary basis component of the test have historically focused on its factual correlation to executive, administrative, and professional employees. *See, e.g.*, Weiss Report at 24 (recognizing that "[t]he evidence at the hearing showed clearly that bona fide executive, administrative, and professional employees are almost universally paid on a salary or fee basis"). Whether this correlation is true today remains an open question.

[25] The holding today has implications beyond the toolpushers at issue in this case, potentially questioning the exempt statuses of other executive, administrative, and professional day rate employees commonly found in industries like oil and gas.

illuminating those duties.  The path that is more faithful to the statute is to construe § 541.601 as precluding § 541.604's application to employees who fall within the HCE provision.[26]  *Cf.* READING LAW at 63 ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").

### III.   CONCLUSION

The majority misreads 29 C.F.R. § 541.601 and other regulations governing when highly compensated employees qualify for the FLSA's EAP exemption.  In doing so, our court turns a blind eye to such employees' duties and construes the regulations in a way that is unmoored from the regulatory text.  I respectfully dissent.

---

[26] There is nothing "purposivist" about reading a regulation within the context of its originating statute.  *See ante*, at ___.  The text of the FLSA includes an EAP exemption, which is "as much a part of the FLSA's purpose as the overtime-pay requirement." *Encino*, 138 S. Ct. at 1142.  The regulations, if possible, should be read in harmony with that text.

No. 19-20023

WIENER, *Circuit Judge*, joined by OWEN, *Chief Judge*, and JONES, DENNIS, and ELROD, *Circuit Judges*, dissenting:

I concur in Judge Jones's thorough dissent. But, as the panel dissenter and one of today's en banc dissenters, I write separately—and at times repetitively—to emphasize how common sense and a reasonable reading of the law combine to demand a result opposite the one reached originally by the panel majority and today by the en banc majority. Frankly, I cannot fathom how a majority of the active judges of this court can vote to require Helix to pay overtime to Hewitt, the supervisor of 12 to 13 hourly, hands-on workers, when he was already paid more than *twice* the *cap* of $100,000 per annum for overtime eligibility. And, if that is not incomprehensible enough, keep in mind that Hewitt worked for Helix *no more than half* of the days during the calendar years at issue!

After the Fair Labor Standards Act ("FLSA") limits time-and-one-half overtime pay to only those workers who are compensated hourly for more than forty hours of work per week, the regulations—starting with § 541.601 ("§ 601")—proceed to cap the entitlement to overtime to those employees whose earnings are deemed to be too high to entitle them to it. Section 601 addresses the most common exclusion: employees whose salaries alone exceed the specified maximum. (The salary cap for overtime was $100,000 per annum for the calendar years at issue here.)

Then, in recognition that there is a subset of workers whose annual wages alone total less than the amount needed to disqualify them from overtime but who nevertheless earn more than that amount when combined with "extras," the exclusionary net's mesh is made finer by the addition of § 541.604 ("§ 604"). It covers that sub-class of workers whose annual wages alone do not exceed § 601's cap for overtime eligibility but whose "wages-plus-extras" do exceed that cap.

Hewitt is excluded from overtime by § 601 for his high salary alone, so we should both start and stop there, never reaching § 604. Today's majority's failing to stop at § 601 but proceeding to § 604 misses the regulations' forest for its trees. The majority focuses on one snippet of regulatory text, ignoring the location of that text within the context of the FLSA and the regulations as a whole.

Common sense and congressional intent should end our inquiry into whether Hewitt—a very highly paid, clean-hands supervisor—is entitled to overtime. Overtime is intended exclusively for front-line, hands-on laborers who earn less than one-fourth of Hewitt's annualized salary and less than half of the salary he actually earned by working for Helix 28 days "on" and 28 days "off"—no more than half of each calendar year.

By working only 28 days on and 28 days off, Hewitt could not have worked for Helix more than 183 or 184 days out of each 365-day year. Yet, for the half-calendar years at issue here, Helix paid Hewitt in excess of $200,000 per annum, more than twice the regulatory cap of $100,000 per full calendar year required by § 601 to be considered a highly-compensated, executive employee and thus not eligible for overtime.[1]

As noted above, § 601 only deals with highly paid employees like Hewitt. Since others are paid less than the regulations consider to be an overtime-exempt "salary" but earn more than that through a combination of a minimum guaranteed wage *plus extras*, the Act catches them in § 604's finer net. But that finer net is never needed, and thus should never be considered, when an employee's salary alone exceeds § 601's cap, as did Hewitt's in the extreme.

---

[1] *See id.* § 541.601(a)(1). The regulatory cap is now $107,432.

No. 19-20023

The FLSA and its regulations have always drawn a distinction between (1) blue collar laborers, who are entitled to overtime, and (2) white collar professionals and supervisors, who from the outset have been excluded from overtime. Hewitt is a member of the latter group. He is a "Tool Pusher," an old Oil Patch term of forgotten origin that does not involve any *pushing* of a *tool*. Rather, it has always designated supervisory employees who perform non-manual work, directing "Roughnecks," another ancient Oil Patch term for the hands-on laborers who do the manual work on oil rigs. Tool pusher Hewitt is *not* a "carpenter, mechanic, plumber, iron worker, craftsman, operating engineer, longshoreman, construction worker," or other manual laborer—such as a roughneck—"who perform work involving repetitive operations with their hands."[2] Hewitt never got his hands dirty— only the twelve or thirteen roughnecks whom he supervised dirtied theirs.

Hewitt is indisputably the type of supervisory or executive employee that has always been excluded from overtime. Ever since 1944, when the FLSA (and, since 2004, the Department of Labor ("DOL")) exempted highly compensated, executive employees from overtime,[3] neither the Supreme Court nor any federal Court of Appeals[4] has ever held that a supervisor like Hewitt—who, as stated above, made more than twice the

---

[2] 29 C.F.R. § 541.601(d).

[3] The FLSA has never made a distinction between high-salaried and low-salaried executive supervisors. *Compare* 29 U.S.C. § 213(a)(1) (1944) (no salary level), *with id.* § 213(a)(1) (same) (2018). As I explain below, the FLSA's omission of a wage cap was intentional.

[4] *Cf. Hughes v. Gulf Interstate Field Servs., Inc.*, 878 F.3d 183, 185 (6th Cir. 2017) (concluding that welding inspectors—who are not supervisors like Hewitt was—are not exempt from overtime); *Coates v. Dassault Falcon Jet Corp.*, 961 F.3d 1039, 1041 (8th Cir. 2020) (same for team leaders and production liaisons). The *Coates* court did not once conclude that either of the employment positions it analyzed were supervisory positions. *See Coates*, 961 F.3d at 1041–48.

regulatory cap of entitlement to overtime by working for Helix no more than half the days in a year—was anything but *not* entitled to overtime. Until today, that is!

I imagine that the original proponents of the FLSA—including President Franklin D. Roosevelt,[5] during whose term the FLSA and other "Great Depression" measures were enacted—are turning over in their respective graves in reaction to the en banc majority's interpretation of the regulatory text to undermine how the FLSA is supposed to operate. It was— and still is—meant to (1) protect the average, non-supervisory, frequently underpaid and overworked, blue-collar common laborer, and (2) influence employers to hire more 40-hour-per-week manual laborers (but not more supervisors, despite the majority's unsupported decision to include them).

---

[5] President Roosevelt issued a statement opposing salary-level amendments to the proposed Act but supported a blanket exemption for, among others, "executive" employees. *See* FDR/OF 3295, Wage & Hour Division, Box 1, 1940 folder, Apr. 25, 1940 (rejecting the Barden Bill, which "would exempt all employees, including manual workers, receiving a guaranteed monthly salary of $150 or more," Letter of Frances Perkins to President Roosevelt (Apr. 16, 1940) (FDR/OF 3295, Wage & Hour Division, DOL, Box 1, 1940 folder)).

Harold Stein, Presiding Officer of the Wage and Hour Division hearings, under whose influence, research, and guidance the FLSA was enacted, found that "[t]here was . . . surprisingly wide agreement that a salary qualification" is an "index to the 'bona fide' . . . executive character [of employment]. . . . The basis of this agreement is easily explained. The term 'executive' implies a certain prestige, status, and importance." If these executives are denied overtime pay, "[i]t must be assumed that they enjoy compensatory privileges and this assumption will clearly fail if they are not paid a salary substantially higher" than the minimum wage. "*[T]he best single test of the employer's good faith in attributing importance to the employee's services is the amount he pays for them.*" United States Department of Labor, Wage and Hour Division, "Executive, Administrative, Professional . . . Outside Salesman Redefined," Report and Recommendation of the Presiding Officer at Hearings Preliminary to Redefinition, Effective Oct. 24, 1940, at 19 (emphasis added) [hereinafter Stein Report].

No. 19-20023

In an effort to support their unprecedented decision, today's majority cites the official rulemaking of the 2004 version of § 601 and notes the failed efforts of Congress during the 1940s "to exempt all highly paid employees."[6] But the reason that the FLSA did not then contain a salary cap for exempting highly paid white-collar employees is *because it did not need such a cap*! It already denied overtime to *all* white-collar employees.[7] In fact, Presiding Officer Stein noted in his report and recommendation (which influenced Congress to adopt the FLSA in 1944) that "the terms 'executive,' 'administrative,' and 'professional' . . . in and of themselves should be construed and were meant by Congress to exclude from the benefits of the [A]ct all white collar workers."[8] Those workers were, "generally speaking, all employees except laborers, machine operators and tenders, craftsmen, and maintenance workers."[9]

So, while it is true that the FLSA did not originally include a salary cap, it did make a distinction between (1) "executive[s]"[10] like Hewitt, who were considered "bosses"[11] and thus not entitled to overtime, and (2) non-

---

[6] *See ante* at 2 (quoting 69 Fed. Reg. 22,122-01 (2004)).

[7] *See* 29 U.S.C. §§ 201–19 (1944); *see also* Deborah C. Malamud, *Engineering The Middle Classes: Class Line-Drawing in New Deal Hours Legislation*, 96 MICH. L. REV. 2212, 2220 & n.29 (1998) (discussing the "executive, administrative, [and] professional" exemption in the originally enacted FLSA and noting that, although the Act included no exemptions to minimum wage provisions for upper-level employees, the Act was devoid of any salary requirement—exemptions "which are still in effect and are still the subject of controversy").

[8] Stein Report, at 6.

[9] *Id.*

[10] 29 U.S.C. § 213(a)(1).

[11] Stein Report, at 4 (Presiding Officer Stein explaining that "executive applies with particular aptness to persons who are commonly called 'bosses'"); *see also* Malamud, *supra* note 7, at 2306.

No. 19-20023

administrative, non-professional, blue-collar workers—like the roughnecks Hewitt supervised—who were entitled to overtime, regardless of how much they were paid.[12] It is on this ground that the Supreme Court cases and ours, which note in dictum that overtime is available even for highly-paid blue-collar workers, must be distinguished from today's case. Those cases analyzed only blue-collar workers, *i.e.*, manual laborers. They did not analyze the FLSA, or even the regulations, as applied to "bosses."[13] Neither did the *Hughes* or *Coates* cases—which the majority relies on for its questionably self-labeled "textualist" position—discuss the regulations as applied to supervisors.[14] That's one reason why it's so bewildering to me for today's majority to insist that Hewitt is eligible for overtime. Supervisors like Hewitt have never been eligible for overtime.

Even more than do common sense and clear congressional intent, the text of the regulations confirms that today's majority is simply wrong. The majority views § 604(b) as an exception to the salary basis test of § 602(a), which is incorporated into § 601 and is thus applicable to all employees who fall under that subsection. In contrast, from its title through its entire text, § 604 covers only that sub-set of employees who are paid a "[m]inimum

---

[12] *See Jewell Ridge Coal Corp. v. Local No. 6167*, 325 U.S. 161, 162, 167 (1945) (noting that underground mine workers "are not deprived of the benefits of the [Act] simply because they are well paid").

[13] *Compare Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 730 (1981) (truckdrivers), *and Jewell Ridge Coal Corp.*, 325 U.S. at 162 (underground mine workers), *and Parrish v. Premier Directional Drilling*, 917 F.3d 369, 375, 388 (5th Cir. 2019) (directional-driller consultants and measurement-while-drilling consultants, both non-managerial, independent contractor positions), *with ante* at 2 (noting dictum from each case and misapplying it to a highly-compensated supervisor).

[14] *See Hughes*, 878 F.3d at 185 (welding inspectors); *Coates*, 961 F.3d at 1041 (team leaders and production liaisons).

guarantee *plus extras*."[15] Section 604 is clearly not applicable to Hewitt, whose salary alone exempted him from overtime and who made no extras![16]

Hewitt *earned* a flat salary of $963 per day for each and every day during which he performed any work at all for Helix, whether fifteen minutes or fifteen hours! And he was *paid* by-weekly, *i.e.*, "on a weekly, or less frequent basis."[17] Furthermore, § 601—under which Hewitt clearly does fall—already contemplates § 604's "[m]inimum guarantee[s] plus extras."[18] As the Second Circuit stated:

> The reading that gives full meaning to both C.F.R. § 541.601 and C.F.R. § 541.604 is that each deals with different groups of employees who receive a 'minimum guarantee plus extras.' The first exemption deals with those employees who earn over

---

[15] *Id.* § 541.604 (emphasis added).

[16] True, every day Hewitt worked beyond one day per week could be labelled an "extra." But additional days worked are not the sort of "extras" that § 604 contemplates. That regulation contemplates, for example, commissions, "flat sum[s], bonus payment[s], and straight-time hourly amount[s]," *see id.* § 541.604(a), and additional guarantees on top of daily rates, *see id.* § 541.604(b). Hewitt made none of those.

[17] *Id.* § 541.602(a).

[18] *See id.* § 541.601(b)(1) (stating that "[t]otal annual compensation may also include commissions, nondiscretionary bonuses, and other nondiscretionary compensation earned during a 52-week period"); *accord Anani v. CVS RX Servs., Inc.*, 730 F.3d 146, 149 (2d Cir. 2013) ("We perceive no cogent reason why the requirements of C.F.R. § 541.604 must be met by an employee meeting the requirements of C.F.R. § 541.601. Indeed, C.F.R. § 541.601 is rendered essentially meaningless if a 'highly compensated employee' must also qualify for the exemption under C.F.R. § 541.604 or, to state the converse, would lose the 'highly compensated employee' exemption by failing to qualify under C.F.R. § 541.604. To be sure, C.F.R. § 541.604 deals with employees who earn the '[m]inimum guarantee plus extras,' but every employee with a guaranteed weekly amount exceeding $455 who earns over $100,000 [annually], and is therefore purportedly exempted by C.F.R. § 541.601, also fits the description of having a 'minimum guarantee plus extras.' Appellant's interpretation thus renders C.F.R. § 541.601 superfluous."); *Litz v. Saint Consulting Grp., Inc.*, 772 F.3d 1, 5 (1st Cir. 2014) (adopting the *Anani* court's analysis of the two regulations).

No. 19-20023

> $100,000 annually while the second exemption deals with employees whose guarantee *with extras* totals less than $100,000 annually.[19]

The example included in § 604(b) reinforces the propriety of the Second Circuit's analysis. It shows exactly why that regulation deals with a different sub-set of employees than those who—like Hewitt—are expressly covered by § 601.

Hewitt's minimum guarantee of $963 per day was more than twice the maximum of those who qualify by not only making a low salary but also "extras." And, again, *Hewitt made no "extras"*! Thus, § 604(b) is facially inapplicable to Hewitt. Indeed, it is a dead letter to employees who, like Hewitt, (1) already make more than §§ 601 and 602(a)'s salary-basis cap and (2) make no "extras" of the kind covered by § 604.

The majority nevertheless posits that § 604(b) is an "exception" or "proviso" to the salary basis test.[20] But that position is internally inconsistent. If § 604(b) were an "exception" to the salary basis test for all *daily* rate employees (no matter how highly paid), why would the Secretary not have included in § 604(b) other important language from the salary basis test of § 602(a), such as the requirements that (1) "the employee regularly receive each pay period on a weekly, or less frequent basis" and (2) the amount be "predetermined" and "not subject to reduction"?[21] Should we assume that the other requirements of § 602(a)'s salary basis test simply do not apply to daily rate, bi-weekly paid employees like Hewitt, so long as they also meet § 604(b)'s salary-plus-extras requirements?

---

[19] *Anani*, 730 F.3d at 149 (emphasis added).

[20] *Ante* at 6.

[21] 29 C.F.R. § 541.602(a).

That simply cannot be. If it could, a daily rate employee's "minimum guarantee" (1) could be subject to reduction, (2) could not be predetermined, and (3) could be disbursed daily rather than "weekly, or less frequent[ly]." And, the majority's "common sense" arguments that (1) "we typically associate the concept of 'salary' with . . . stability and security"[22] and (2) § 604(b) allows an employee to anticipate what he will earn,[23] would crumble. Yet the majority's analysis leads directly to such untenable results, without any explanation or textual support whatsoever.

Neither can § 604(b) be a "proviso" to the salary basis test. According to the majority's own reasoning, a daily rate cannot be received "on a weekly, or less frequent basis," and cannot be received "without regard to the number of days or hours worked." But these are two requirements of the salary basis test.[24] Therefore, according to the majority's reasoning, § 604(b) must be an exception to the salary basis test's requirements, not a "proviso." According to the majority, meeting that test's requirements on its own terms is simply impossible. As stated in the preceding paragraph, if § 604(b) were an exception to a daily-rate employee's meeting the salary basis test's requirements, then that salary could (1) be subject to reduction, (2) not be predetermined, and (3) be disbursed daily rather than "weekly or less frequently." The majority's position on this point is simply untenable.

The First and Second Circuits have already recognized that there is an easy and logical way to read § 601 and § 604(b) in harmony: *Each section applies to an entirely different subset of employees!*[25] Hewitt was clearly a

---

[22] *See ante* at 3

[23] *See id.* at 8.

[24] *See* 29 C.F.R. § 541.602(a), (a)(1).

[25] *See supra* note 18.

member of the § 601 subset (he was paid in excess of $100,000 per annum). He was just as clearly *not* a member of the § 604 subset (he earned too much *and* he received no extras).

In stark contrast to those other circuits' indisputably correct analyses, the way that today's majority proposes to harmonize § 601 and § 604(b) simply will not work. *It applies rules to oranges that are intended for apples*! The majority focuses on an isolated phrase in one subsection of § 604 and applies it not only to hourly rate workers but to *all* daily rate employees too, regardless of (1) how much money they are paid, (2) whether or not they receive "extras," and (3) whether they are supervisory employees or manual laborers.

Most importantly, perhaps, the majority's new overtime test for highly compensated, daily rate, executive employees is entirely detached from the reality of our time. Back in the 1940s, when the FLSA was enacted, exemptions were based on "class" lines.[26] Hourly rate, blue collar laborers were considered to be low class, while daily, weekly, and monthly rate, white collar employees were considered high class.[27] In fact, Presiding Officer Stein explicitly noted that daily rate workers like Hewitt *could* qualify as salary based. He stated in his report and recommendation that "[a]nother type of situation in which the [salary basis] requirement will be met is that of an employee paid on a daily or shift basis, if the employment arrangement

---

[26] *See generally* Malamud, *supra* note 7.

[27] *See id.* at 2288 (noting President Roosevelt's Secretary of Labor Frances Perkins's understanding "that the division between 'hourly' versus 'salaried' workers was not merely random—that there was a tradition of paying factory workers of all skill levels on an hourly rate and office, supervisory, and professional staff regardless of duties on a salaried basis").

includes a provision that he will receive not less than the amount specified in the regulations in any week in which he performs any work."[28]

Today—almost eighty years later—class lines have been abandoned. Today, paying *daily* rates to supervisory, executive employees (including those working in the mineral exploration, discovery, and production industry) is not only common: It is a necessary method of calculating compensation. Amici helpfully point out that daily rates for tool pushers "reflect the historic economic balance the industry must maintain given the highly unpredictable nature of oil patch work." The Supreme Court has "counsel[ed]" us "in favor of a functional, rather than a formal, inquiry, one that views an employee's responsibilities *in the context of the particular industry* in which the employee works."[29]

Yet today's majority ignores the Supreme Court's guidance in favor of an antiquated view of what is a "salary," stating that a daily-rate-only method of payment can never be considered a salary.[30] If that holding is allowed to stand, the "oyl biddness," a vital industry in our region and one which provides more than 400,000 direct jobs, will suffer needlessly and excessively.

In sum, both the purpose and the text of the FLSA and its regulations demand a result opposite the one reached by both the panel majority and today's en banc majority. Those majorities proudly and repeatedly call themselves "textualist" for reaching that result. But—as I believe I have

---

[28] Stein Report, at 26.

[29] *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 161 (2012) (emphasis added).

[30] *See ante* at 3 ("By contrast, we do not ordinarily think of daily or hourly wage earners . . . as 'salaried' employees."); *id.* at 4 (requiring a minimum guarantee in addition to a daily rate for a daily rate employee's earnings arrangement to be considered salary).

shown—the correct reading of the applicable texts demands the opposite outcome. And, by engaging in only its skewed version of textualism while ignoring or misapplying the history of the exemptions, the majority's holding contravenes common sense and provides a detailed but ultimately unnecessary and misguided discussion.[31]

We should be very dubious whenever the regulatory text is interpreted in isolation to reach an illogical and unexpected result. This is just such a case.

I respectfully dissent.

---

[31] I suspect that one of the majority's responses to my "common sense" approach will be that it is common sense that workers would rather spend some time at home with loved ones rather than at work. *See ante* at 26 ("Millions of Americans prefer more free time over more money."). While true in the abstract, this response ignores the fact that exemptions to the FLSA's overtime requirements exist in the first place. Do most employees enjoy their free time? Yes, but not all employees are entitled to overtime pay just because they enjoy their free time.